**SANDS, TAYLOR & WOOD,**
**Plaintiff–Appellee,**

v.

**The QUAKER OATS COMPANY,**
**Defendant–Appellant.**

**No. 93–2687.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 24, 1994.

Decided Sept. 13, 1994.

James A. Klenk (argued), Michael A. Schlanger, Samuel Fifer, Carol Anne Been, Sally L. Davis, Sonnenschein, Nath & Rosenthal, Edward M. Keating, Alfred H. Plyer, Jr., Kinzer, Plyer, Dorn, McEachran & Jambor, Chicago, IL, Geoffrey J. Vitt, Diane Runyan Bech, Brooks, McNally, Whittington, Platt & Vitt, Norwich, VT, for plaintiff-appellee.

William E. Wallace, III (argued), Howrey & Simon, Washington, DC, William T. Cahill, Thomas P. Cimino, Jr., Pope, Cahill & Devine, Robert G. Krupka, Kirkland & Ellis, Chicago, IL, for defendant-appellant.

Before FAIRCHILD, CUDAHY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

In this appeal, we review the district court's award of damages for the infringement of a federally registered trademark.

We reversed the district court's first award. *Sands, Taylor & Wood v. Quaker Oats Co.,* 978 F.2d 947 (7th Cir.1992) ("*Sands I*"), *cert. denied,* — U.S. —, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993). The district court redetermined the plaintiff's damages and entered judgment in favor of the plaintiff for $20,656,-822. The court also awarded prejudgment interest, calculated from that portion of the verdict representing a reasonable royalty, in the amount of $5,431,413. For the reasons that follow, we affirm in part and vacate in part the judgment of the district court and remand for further proceedings.

# I

## BACKGROUND

### A. *Earlier Proceedings*

The details of this litigation are recounted fully in our first opinion. *Sands I,* 978 F.2d at 949–51. We therefore set forth below only those facts essential to the resolution of issues before us and refer the reader to our earlier opinion for additional details.

In 1984, Sands, Taylor & Wood ("STW") brought suit against The Quaker Oats Company ("Quaker") for violations of the Lanham Act, 15 U.S.C. § 1051. It alleged that Quaker was infringing STW's trademark, "Thirst–Aid," in a nationally-televised commercial advertising campaign promoting Quaker's isotonic beverage, "Gatorade." Quaker continued using the mark until 1990, when, after a bench trial, the district court ruled that Quaker's use was infringing STW's trademark. The district court awarded STW 10% of Quaker's pre-tax profits on Gatorade for the period during which Quaker used Thirst–Aid in its advertising campaign. This award of profits amounted to $31,392,493. The court also awarded STW attorneys' fees and costs as well as prejudgment interest.

In its first opinion, the district court examined the types of relief that it could award under the Lanham Act. The district court first determined that STW was entitled to profits. It noted, however, that forcing Quaker to disgorge all of its profits from the sales of Gatorade during the period of infringement might overcompensate STW:

> Defendant's profits may be significantly disproportionate to plaintiff's circumstances, such that an award of profits may represent punishment to the defendant (as opposed to compensation for the plaintiff), and unjustifiable enrichment and a windfall to the plaintiff. Therefore, the amount of profits to be awarded should be related to the financial benefit received because of the unlawful use of the mark.

Appellant's App. at 106a (citations omitted). The district court therefore attempted to assess that portion of Quaker's profits attributable to the Thirst–Aid mark. In its analysis, it rejected the opinion of Dr. William Lynk, Quaker's expert, that the Thirst–Aid mark had little to do with Gatorade's success:

> We find Dr. Lynk's testimony of little value in estimating the financial benefits defendant gained from the Thirst Aid Campaign. While admittedly the Thirst Aid campaign is not the sole cause of Gatorade's success, the defendant's substantial and continuous commitment to the campaign suggests that the Thirst Aid message is a valuable component in Gatorade's overall marketing effort.

*Id.* at 107a. Believing that at least a portion of the profits could be attributed to Quaker's illegal use of the mark, it concluded:

> Many factors have contributed to Gatorade's success. But, it is reasonable to infer that defendant's aggressive THIRST–AID advertising campaign was responsible for 10% of the product's success and hence profits. Defendant's profits on Gatorade sales were 247.3 million dollars. Accordingly, we award plaintiff $24,730,000.00 (10% of defendant's before tax profits) for defendant's willful infringement of plaintiff's mark and to prevent defendant's unjust enrichment from its use.

*Id.* at 108a (citations omitted).

The district court then considered and dismissed as inappropriate other forms of monetary relief. With regard to actual damages, the court found that STW had not presented any evidence of lost profits or sales. It rejected STW's argument that its licensing proposals to other major companies, refused

by those firms because of the Gatorade campaign, resulted in actual damage:

> We reject both proposals as evidence of plaintiff's actual damage.... Both proposals represent conjectural lost business opportunities which may or may not have proceeded but for defendant's advertising. We fail to see how these lost opportunities constitute actual harm justifying a damage award separate from defendants' profits.

*Id.* at 109a. The court similarly found an award for corrective advertising inappropriate. Corrective advertising awards, explained the court, have been used "to restore plaintiff's reputation to its former level via an actual reparative advertising campaign." *Id.* at 110a. Because STW had not made concurrent use of the Thirst–Aid mark, there was no need to counteract Quaker's advertising.

Finally, the court rejected an award of a reasonable royalty. The cases STW had relied on to support such an award, held the court, were inapposite because in those cases there had been actual negotiations between the parties to serve as a basis for an award of a reasonable royalty. By contrast,

> [t]he parties in this case never considered a licensing agreement. Thus, any measure of damages based upon a royalty would force the court to engage in a hypothetical inquiry into what would have been a reasonable royalty for the defendant to pay plaintiff had the parties contemplated a royalty arrangement. Damages predicated on a speculative royalty rate are clearly inappropriate.

*Id.* at 112a. Quaker appealed to this court.

On that appeal, we affirmed the judgment of the district court insofar as it found Quaker's use of the Thirst–Aid mark to be infringing, but we vacated the district court's monetary award which was based on Quaker's profits on Gatorade. On the question of damages, we directed that the district court apply the following guiding principles on remand:

(1) the court may not simply award STW a percentage of Quaker's profits; (2) the court should use a reasonable royalty as a baseline or starting point for determining the appropriate award; (3) in determining the appropriate award, the court may take into account the possible need for deterrence, which may involve consideration of the amount of Quaker's profits.

*Sands I*, 978 F.2d at 963 n. 19.

### B. *The Recalculation of STW's Damages*

The district court's first step on remand was to determine a reasonable royalty rate for the Thirst–Aid mark. The court assumed that this figure should be based on Quaker's yearly Gatorade sales, excluding for each year of infringement the pre-infringement sales level of $95 million. R. 401 at 10. To determine a reasonable royalty, the court considered what a hypothetical negotiation for the right to license the Thirst–Aid mark would yield. First, it noted that the Thirst–Aid mark had proven a successful marketing tool when another company, Pet, Inc., test-marketed an isotonic beverage in 1980. Second, the court observed that Gatorade's sales had slumped prior to Quaker's infringement and therefore that Quaker was in need of a new marketing approach for the product. Third, it noted that Quaker had considered the proposed advertising campaign based on the Thirst–Aid mark to be superior to the alternatives. Fourth, the court considered STW's proposed rate of 1% for the first year of infringement and .5% for each subsequent year of infringement. The court compared this proposed rate with expert testimony adduced at trial regarding a reasonable rate for the Thirst–Aid mark.[1] It also compared this proposed rate with other royalty rates for trademark licenses and found it smaller, except for the rate Pet paid for its brief use of the Thirst–Aid mark in 1980, which was a flat fee of $10,000 plus a .5% running royalty on sales for the first ten months and thereafter .33% of sales. Finally, the court considered, but found unpersuasive, Quaker's position

---

**1.** In its Proposed Findings of Fact and Conclusions of Law to the district court, STW stated that "[a] running royalty rate of one percent through the first fiscal year and .5 percent thereafter is on the low end of the range of reasonableness." R.388 at 34. STW explicitly noted that the record supported a royalty significantly higher and that, in fact, the 1%–.5% royalty "is not adequate to fully compensate STW." *Id.* at 35.

that a flat fee of $100,000 would exceed the fair market value of the Thirst–Aid mark in 1984.

After discussing the above considerations, the court decided to use STW's proposed royalty rate of 1% for the first year of infringement and .5% for each successive year of infringement. Applying this rate to Quaker's sales of Gatorade during the period of infringement (minus the pre-infringement sales level), the court calculated the baseline royalty to be $10,328,411. R.401 at 15. In determining this rate, the court said that it had considered

> plaintiff's prior licenses, (defendant has declined to disclose its prior licenses), plaintiff's licensing policies, the nature and scope of defendant's infringing use ... the special value of THIRST–AID to defendant in 1984 (the huge increase in sales during infringement followed by a sharp decline after infringement ceased), the profitability of the defendant's infringement, the questionable attractiveness of defendant's alternatives, the expert opinions and defendant's persistent infringement in the face of the admonitions by its inside and outside counsel and my May 1985 ruling that it was infringing.

*Id.* at 14–15. It also noted that its determination was merely an " '*attempt* to measure the value to the infringer,' " *id.* at 10 (quoting James M. Koelmay, *Monetary Relief for Trademark Infringement Under the Lanham Act,* 72 Trademark Rptr. 459, 544 (1982)) (emphasis added), and necessarily involved speculation, *id.*

Having established as a baseline a reasonable royalty of over $10 million, the court then addressed whether the award ought to be enhanced. It posed the question in the following terms:

> Will the imposition of a hypothetical licensing royalty deter predatory conduct such

as defendant's? I doubt it. The royalty is nothing more than an approximation of what defendant would have paid plaintiff had defendant acted lawfully. "[An] infringer [has] nothing to lose, and everything to gain if [it] could count on paying only the normal, routine royalty, noninfringers might have paid ... [T]he infringer would be in a 'heads-I-win, tails-you-lose position.' " *Panduit Corp. v. Stahlin [Bros.] Fibre Works,* 575 F.2d 1152, 1158 (6th Cir.1978).

R.401 at 15–16. The court decided that "[t]o deter conduct such as defendant's," *id.* at 17, it would double the amount of the hypothetical royalty from $10,328,411 to $20,656,822. The court added $5,431,413 in prejudgment interest to the baseline portion of the award.[2] The final sum was therefore $26,088,235 (compared to the original award of $41,996,680, when factoring the same components). The court also awarded over $400,000 in attorneys' fees and expenses; these fees and expenses are not disputed on appeal.

## II

## DISCUSSION

Although the appellant's brief invites us, directly and by suggestion, to address a number of issues already settled at earlier stages of this litigation—a tactic that has detracted substantially from the overall helpfulness of the brief—we emphatically decline to revisit those issues. The only issue before us in this appeal is whether the judgment under review conforms with our earlier decision and the governing principles of law embodied in that decision.

### A. *Calculation of the Royalty Rate*

■■■ We turn first to the district court's calculation of the royalty.[3] The district court accepted STW's proposed hypothetical royal-

---

**2.** Although the court in *Sands I* vacated the award of prejudgment interest for recalculation based on whatever new award the district court calculated, *see* 978 F.2d at 963, the district court reinstated its original award of prejudgment interest, expressing the view that "the award of [prejudgment interest] was affirmed by the Court of Appeals." R.401 at 15. Quaker does not challenge the district court's award of prejudg-

ment interest except insofar as it is based on the $10 million royalty determination.

**3.** *See Ramada Inns, Inc. v. Gadsden Motel Co.,* 804 F.2d 1562, 1565 (11th Cir.1986) (noting that loss of royalty payments during the period of infringement is a proper measure of damages for the misuse of the mark).

ty rate of 1% of Gatorade sales, minus preinfringement sales levels, for the first year of infringement, and .5% for each year of infringement thereafter. We are convinced that the district court committed no reversible error in deciding upon this valuation, and that this rate is in accord with our mandate in *Sands I* that the district court calculate a "reasonable royalty." 978 F.2d at 963 n. 19. Nevertheless, for the sake of completeness, we shall address the main arguments presented to us on appeal.[4]

Quaker contends that the royalty is not reasonable because the 1%–.5% rate is almost double the rate paid by Pet, which licensed the Thirst–Aid mark in 1980. However, the record contains evidence that the value of the Thirst–Aid mark was higher in 1984 than in 1980, thus justifying a rate in 1984 higher than that paid by Pet in 1980. In 1980, the Thirst–Aid mark had not been used in connection with an isotonic beverage; in that context, the mark was untested and unproven. Pet's experience showed that the mark had promise: In a four-month period, Pet's beverage captured 25% of the isotonic beverage market in the test area. In addition, we must consider Quaker's need for the mark. In 1984, the time of the hypothetical negotiation contemplated by the district court, Quaker was about to launch a national advertising campaign based on the Thirst–

Aid mark. If it had failed to secure the right to use the mark, then it would have had to use one of its alternative advertising campaigns. Consumer testing revealed that the Thirst–Aid campaign was the best of the options available to Quaker. *See* J.A. 1643–56, 2677–78. (As we shall discuss below at greater length, these variables injected significant ambiguity into the royalty calculation. Nevertheless, they could not be ignored and the district court was entitled to consider them.) We also note that the rate selected by the district court was substantially lower than the rate used by STW for some other licensing ventures and lower than that suggested by its own expert witness. *See* J.A. at 766–68.[5] We conclude that the district court did not err in calculating a reasonably royalty of $10,328,411.[6]

**B.** *Enhancement of the Reasonable Royalty*

**1.**

*Sands I* directed the district court to "use a reasonable royalty as a baseline or starting point for determining the appropriate award." 978 F.2d at 963 n. 19. We then stated that "in determining the appropriate award, the court may take into account the possible need for deterrence, which may involve consideration of the amount of Quak-

---

4. Quaker submits that the district court erred by basing its reasonable-royalty calculation on the premise that STW, not Karp, owned the Thirst–Aid mark in 1984. Quaker maintains this is material because the evidence indicates that negotiations between Quaker and Karp would have resulted in a figure much lower than the district court's Quaker–STW royalty estimate. Appellant's Br. at 23–26. Quaker's argument ignores an important fact: The 1981 agreement selling the Thirst–Aid mark to Karp also "licensed back to STW 'the exclusive right and license' to use the [Thirst–Aid mark] in connection with certain defined 'Products' in the retail trade only." *Sands I*, 978 F.2d at 957. Clearly, STW had the exclusive right to use the Thirst–Aid mark (in the circumstances relevant to this case). Because in 1984 STW had the right to use the mark, it is reasonable to consider STW the licensor rather than Karp, even though Karp owned the mark.

5. Specifically, STW's expert suggested a running royalty of 2% of gross sales for year one, 1.5% of gross sales for year two, 1% of gross sales for years three through ten, and .5% of gross sales thereafter. J.A. at 766. When this rate is ap-

plied to Quaker's actual sales of Gatorade for the infringement period, *see* R.388 at 19, the rate yields a royalty of $30,500,000. R.388 at 35.

It may seem somewhat anomalous that STW's expert testified to a rate that yielded a royalty nearly double that yielded when using STW's proposed rate. However, the record reveals that STW clearly predicated its suggestion of a 1%–.5% royalty on the ground that the district could treble the award to compensate it fully for its loss. *See supra* note 1.

6. The appellant's brief suggests that the district court's opinion evidences, through its constant reference to the 1985 infringement opinion, a prejudgment of the infringement issue that denied it due process. It also suggests that the district court exhibited an "implacable mindset" throughout the remand proceedings and was determined to punish Quaker. A review of the record makes it clear that these allegations are simply not worthy of extended reply and only serve to distract both court and counsel from the serious task at hand. We trust that a more measured tone will characterize the appellant's future submissions.

er's profits." *Id.* On remand, the district court explicitly considered whether it should award more than the approximately $10 million for the reasonable royalty:

> Is this award adequate? Defendant knowingly and in bad faith infringed plaintiff's incontestable mark. Defendant knew of the mark. It knew of its registration. It knew it was incontestable. It knew that it had been used successfully by Pet. It was told immediately following its public use that it was infringing and would damage plaintiff's mark. It disregarded the advice of its outside trademark counsel to minimize its use of THIRST–AID in its advertising. It persisted for five years in its infringing use of plaintiff's THIRST–AID mark after I ruled in June, 1985 that its use was infringing.[7] Will the imposition of a hypothetical licensing royalty deter predatory conduct such as defendant's? I doubt it.

R.401 at 15. In order to deter conduct such as Quaker's, the district court doubled the amount of the hypothetical royalty to over $20 million. *Id.* at 17.

Quaker maintains on appeal that the increased award violates the Lanham Act. Specifically, Quaker contends that section 35(a), 15 U.S.C. § 1117(a), prohibits any award that constitutes a "penalty," and that the doubling of the hypothetical royalty constituted such prohibited punishment. STW counters that the district court's opinion makes no mention of punishment, only deterrence. Moreover, STW notes that, even under the district court's award, Quaker is left with huge profits from Gatorade sales during the period of infringement.[8]

██ In assessing these contentions, we shall begin, as we must when we deal with statutory materials, with the language of the statute itself. In *Park N' Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985), the Supreme Court, construing a section of the Lanham Act, wrote that "[s]tatutory construction must always begin with the language employed by Congress and the assumption that the ordinary meaning of the language accurately expresses the legislative purpose." Accordingly, § 1117(a) provides:

> (a) When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 1125(a) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provision of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be

7. This is a reference to the district court's June 1985 ruling on the parties' cross-motions for summary judgment on the issue of "fair use" in which the court stated: "Plaintiff's motion for summary judgment on the issue of infringement is granted." Appellant's App. at 124a. When informed that the issue of infringement had not been raised in the parties' motions, the court vacated its earlier ruling with respect to the infringement issue. *Id.* at 125a–26a.

Quaker maintains that it was denied due process because the district court based its revised damages calculation on the belief that Quaker continued using (and hence infringing) the Thirst–Aid mark after a ruling that such use was infringing. STW concedes that the court's wording was imprecise but argues that it was simply "a shorthand way of describing what the District Court did at the time." Appellee's Br. at 31–32. (The district court vacated the ruling on infringement, but, in that subsequent order, admonished Quaker that "it appear[ed] highly unlikely that

plaintiff will be unable to establish likelihood of confusion." Appellant's App. at 125a–26a.)

Looking at the district court's statement in context, it provides no basis for reversal of the judgment. In 1990, the district court conducted a five-week bench trial in which the main issue was whether Quaker infringed the Thirst–Aid mark. *See* Appellee's Br. at 33. After trial, the court issued a lengthy opinion in which it concluded that Quaker infringed STW's mark. *See* Appellant's App. at 65a–125a. In our view, it is utterly implausible to suggest that the district court somehow forgot about all of this and actually thought that it had decided, definitively, in 1985 that Quaker had infringed. Because the circumstances of the case make it highly unlikely that the district court relied on the vacated legal ruling, we conclude that Quaker's due process rights were not violated.

8. Quaker's pre-tax profits for Gatorade during the years that Quaker used the Thirst–Aid mark totalled $313,924,930. Appellant's App. at 56a.

required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

This section therefore allows an award of three nonexclusive monetary remedies: (1) recovery of profits; (2) damages sustained by the plaintiff; and (3) costs of the action.

Although there is respectable modern scholarship to the contrary,[9] the penultimate sentence in the section generally has been construed in the caselaw as a limitation on the authority of courts to impose enhanced monetary judgments. Consequently, the caselaw recites, albeit without very much substantive elaboration, that monetary recovery under section 35(a) of the Lanham Act must be compensatory in nature and not punitive.[10] Indeed, in a thoughtful opinion, Judge Cardamone of the Second Circuit has argued that the rather tortuous legislative history of this section also substantiates this view. *See Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 109–111 (2d Cir.1988), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). Such an interpretation of the penultimate clause has been described as "troublesome."[11] Judge Reavley, writing for the Fifth Circuit, has described the situation created by such an interpretation in these terms: "It is anomalous to say that an enhancement of damages, which implies an award exceeding the amount found 'compensatory,' must be 'compensatory' and not 'punitive.'" *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir.1991), *aff'd on other grounds*, — U.S. —, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

■ In grappling with this textual tension, the courts have identified several significant guideposts. For instance, it has been long recognized that this section, despite its remedial nature, is intended, along with the other sections of the Lanham Act, to protect an important public interest. In *Getty*, Judge Cardamone expressed that interest succinctly:

9. *See* Ralph S. Brown, *Civil Remedies for Intellectual Property Invasions: Themes and Variations*, 55 Law & Contemp.Probs. 45, 74–76 (1992) (arguing that the penultimate sentence of the section ought not be read as an admonition, but as a declaration designed to ensure that the resulting judgment will be recognized and enforced in other jurisdictions). If this interpretation is correct, the provision is not a caution against enhancement, but an invitation to enhance in the appropriate case.

10. *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1157 (7th Cir.1994) ("Under this section any recovery to the plaintiff must constitute 'compensation' for its own losses or for the defendant's unjust enrichment; section 1117(a) (unlike section 1117(b)) does not allow a 'penalty' against the defendant."); *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir.1991) ("It is anomalous to say that an enhancement to damages, which implies an award exceeding the amount found 'compensatory,' must be 'compensatory' and not 'punitive.' Responding to that anomaly, we have suggested that enhancement could, consistent with the 'principles of equity' promoted in section 35, provide proper redress to an otherwise undercompensated plaintiff where imprecise damage calculations fail to do justice, particularly where the imprecision results from defendant's conduct."), *aff'd on other grounds*, — U.S. —, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Jurgens v. McKasy*, 927 F.2d 1552, 1563–64 (Fed.Cir.1991) ("*Metric* makes clear that the district judge may increase damages, 'providing it does not award such relief as a penalty.'") (applying Eighth Circuit law), *cert. denied*, — U.S. —, 112 S.Ct. 281, 116 L.Ed.2d 232 (1991); *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 970 (D.C.Cir.1990) ("This provision gives the court discretion to enhance damages, as long as the ultimate award qualified as 'compensation and not [as] a penalty.'"); *Metric & Multistandard Components Corp. v. Metric's Inc.*, 635 F.2d 710, 715 (8th Cir.1980) ("The language of section 35 is clear: the district court is given broad discretion to award the monetary relief necessary to serve the interests of justice, provided it does not award such relief as a penalty.").

11. Brown, *supra* note 9, at 74.

The purposes underlying the Lanham Trademark Act of 1946 are to protect the public so it may buy a product bearing a particular trademark with confidence that it will get the product it wants and to protect the holder of the mark's investment in time and money from its misappropriation by pirates and cheats.

*Getty,* 858 F.2d at 105. Consequently, the courts have required that the final remedy imposed under section 35(a) provide a sufficient deterrent to ensure that the guilty party will not return to its former ways and once again pollute the marketplace. In *Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.,* 692 F.2d 1272, 1274 (9th Cir.1982), the court noted that, in its earlier case, *Maier Brewing Co. v. Fleischmann Distilling Corp.,* 390 F.2d 117 (9th Cir.), *cert. denied,* 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968), it had stressed that, "the trial court's primary function should center on making any violations of the Lanham Act unprofitable to the infringing party." The court specifically noted that the

> award of little more than nominal damages would encourage a counterfeiter to merely switch from one infringing scheme to another as soon as the infringed owner became aware of the fabrication. Such a method of enforcement would fail to serve as a convincing deterrent to the profit maximizing entrepreneur who engages in trademark piracy. The judicial penalties imposed under such an approach would be simply factored into the infringer's profit and loss statement. If after deducting this "judicial expense" the entrepreneur still earns a suitable return on his investment he will continue the infringing activities. Under these circumstances, the best advice to a counterfeiter would be to plead the Fifth Amendment, provide no documents and if the trademark owner is able to obtain evidence of the counterfeiting activities through third party discovery, simply pay as a "judicial expense" no more than a reasonable royalty on the goods sold. Through the employment of such ineffective remedies the counterfeiter escapes without suffering the economic harm necessary to serve as a deterrent to future infringing activities.

*Playboy,* 692 F.2d at 1274–75. The court noted what it termed "the practical reality" of this approach: "Would a profit-seeking business person not unwilling to violate federal law pay ten cents to make one dollar? If the answer is 'yes,' then the willful trademark infringement has not been made sufficiently unprofitable." *Id.* at 1275.

Our circuit has recognized that the need for deterrence is an important dimension of section 35(a). Most recently, Judge Easterbrook, writing for the court in *Zazu Designs v. L'Oreal,* 979 F.2d 499, 507 (7th Cir.1992), discussed an award of one million dollars to a trademark infringement plaintiff that was "explicitly punitive." He stated:

> The district court found that L'Oreal had wilfully infringed ZHD's mark and that "its conduct before and during the litigation ha[d] been oppressive and deceitful." Believing at the time that L'Oreal's net worth was $20 million, the court opined that an award of 5% of this sum was necessary to deter such conduct in the future. Punitive damages are problematic because the Lanham Act, although providing for the trebling of compensatory damages, forbids other penalties.

*Id.* (citations omitted). Our present Chief Judge, writing for the court in *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.,* 874 F.2d 431 (7th Cir.1989), stated:

> So weak are the Gorensteins' arguments regarding their infringement of Quality Care's trademark, and so deliberate the infringement, that it might have been an abuse of discretion for the district judge *not* to have awarded Quality Care treble damages, attorney's fees, and prejudgment interest. Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), provides that, "subject to the principles of equity," the owner of the infringed trademark shall be entitled to his damages; and "in assessing damages, the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." The same section provides that "the court, in exceptional cases, may award reasonable attorney fees to the pre-

vailing party." These provisions are properly invoked when, as in this case, the infringement is deliberate.

*Id.* at 435–36 (citations omitted). In *Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931 (7th Cir.1989), *cert. denied,* 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990), Judge Cummings evaluated an award of profits to a trademark infringement plaintiff. In the course of his discussion, he noted:

> The Lanham Act specifically provides for the awarding of profits in the discretion of the judge subject only to principles of equity. As stated by this Court, "The trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party." Other than general equitable considerations, there is no express requirement that the parties be in direct competition or that the infringer wilfully infringe the trade dress to justify an award of profits. Profits are awarded under different rationales including unjust enrichment, *deterrence,* and compensation.... Here ... an award of profits was appropriate under *either a deterrence or unjust enrichment theory* even if plaintiff's actual sustained losses may have been less. Given the evidence of intentional imitation and the substantial similarity between the two card lines, the district judge's decision to instruct the jury that an award of profits would be appropriate was not an abuse of discretion.

*Id.* at 941 (citations omitted) (emphasis added).[12] A year later, Judge Eschbach, writing for the Court in *Web Printing Controls Co., Inc. v. Oxy–Dry Corp.,* 906 F.2d 1202, 1205 (7th Cir.1990), noted that many of the remedies available under the Lanham Act "flow not from the plaintiff's proof of its injury or damage, but from its proof of the defendant's unjust enrichment or the need for deterrence."

We have, however, remained cognizant of the tension between the explicit provision in section 35(a) for enhanced damages and the limitation posed by the penultimate sentence of the section. In *Otis Clap & Son, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738 (7th Cir.1985), we dealt with this tension in rather explicit terms. We stated that "[t]he trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party." *Id.* at 744. At the same time, however, the court noted that section 35(a) clearly contained limitations on the authority of a court to achieve that purpose through the imposition of monetary awards. We stated:

> "[A]n award of little more than nominal damages would encourage a counterfeiter to merely switch from one infringing scheme to another as soon as the infringed owner became aware of the fabrication. Such a method of enforcement would fail to serve as a convincing deterrent to the profit maximizing entrepreneur who engages in trademark piracy." On the other hand, § 1117 forbids the district court from allowing recoveries that are so excessive as to amount to a penalty. *Therefore, the monetary relief granted by the district court must be great enough to further the statute's goal of discouraging trademark infringement but must not be so large as to constitute a penalty.*

*Id.* (quoting *Playboy,* 692 F.2d at 1274) (emphasis added). A further cautionary note was sounded in *Badger Meter, Inc. v. Grinnell Corp.,* 13 F.3d 1145, 1157 (7th Cir.1994). There the court, through the pen of Judge Cummings, emphasized that any monetary award ought to be grounded in either an ascertainable loss of the plaintiff or a benefit accruing to the defendant on account of its infringement. *Id.* Moreover, it described the enhancement of an award under this

---

**12.** The Fifth Circuit also has expressed a similar theme in *Maltina Corp. v. Cawy Bottling Co., Inc.,* 613 F.2d 582 (5th Cir.1980):

> In the instant case, the district court found that Cawy's "infringement was willful and that such infringement resulted in [Cawy] being unjustly enriched...." Cawy used the "Cristal" mark after the patent office refused to register it. This clearly and explicitly supports

the finding of willful infringement. An injunction alone will not adequately deter future infringement. In short, we find the district court properly ordered Cawy to account to the plaintiffs for the profits it earned from its willful infringement. *This accounting serves two purposes: remedying unjust enrichment and deterring future infringement.*

*Id.* at 585 (citations omitted) (emphasis added).

section as a method by which a fair recovery might be approximated when damages and profits are not easily ascertainable. *Id.*[13] In *Taco Cabana*, 932 F.2d at 1127, that same theme was sounded by the Fifth Circuit, although the court left intact its earlier decision in *Maltina Corp. v. Cawy Bottling Co., Inc.*, 613 F.2d 582, 585 (5th Cir.1980), that had recognized the legitimacy of deterrence.[14]

### 2.

We turn now to the circumstances that face us in this appeal. In our view, an accurate and fair assessment of the parties' contentions requires a review of the context in which we asked the district court to reassess the monetary award.

Our earlier opinion reversed an award that reflected the district court's belief that ten percent of Quaker's profits from the sale of Gatorade could be attributed to the advertising campaign that infringed upon STW's mark. As the controlling portion of our earlier opinion makes quite clear, our discomfort with that award was grounded in a concern not so much with the amount of the award but with the approach of the district court, which, we believed, was methodologically flawed. Based solely on an estimation of the amount of profits attributable to the illegality, such an award was not the most accurate possible reflection of the actual loss incurred by STW. We therefore required the district court to undertake a reassessment of its award that would require it to address more precisely the actual loss of STW. Accordingly, we held that the district court ought to begin with the one measure of actual damages that, *if* ascertained with reasonable certainty, could be said to reflect the actual loss of STW—the cost of a reasonable royalty.

*See Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir.1986) (noting that royalties normally received for the use of a mark are the proper measure of damages for the misuse of the mark). Although under no misapprehensions about the difficulty that might be encountered in determining this figure with any accuracy, we believed that this measure would serve as the most appropriate baseline in fashioning the final award. *Cf. Badger Meter*, 13 F.3d at 1157 (noting that in computing recovery under § 1117(a) "the plaintiff's provable damages are the benchmark for determining whether an award constitutes compensation"). We went on to note that, in arriving at a final figure, the district court ought to be cognizant of the need for deterrence, a consideration that, in turn, might well require a consideration of Quaker's profits during the infringement period. It is the doubling of the calculated royalty, in an effort to comply with this latter part of our directive, that Quaker now characterizes as punitive and therefore contrary to the provisions of the penultimate sentence of section 35(a).

Some of the remedial devices available under section 35(a) ensure with relative ease that the malefactor is in fact deprived of any reward for its wrongdoing. When profits are the appropriate measure of damages, and the damages are easily ascertainable, the deterrence objective of the Act has been satisfied.[15] On the other hand, royalty payments pose difficult problems with respect to the need to ensure that the defendant has been divested of its ill-gotten gain. More specifically, two aspects of an award of a reasonable royalty make it difficult to ensure that the Act's policy concern of deterrence has been adequately addressed. First, be-

---

**13.** Notably, *Badger Meter* did not discuss critically, and certainly did not purport to overrule, any of the cases of this circuit that deal with the deterrence factor in assessing monetary awards. Indeed, it explicitly noted that *Roulo* had considered deterrence as a factor in determining the appropriate award. *Badger Meter*, 13 F.3d at 1157.

**14.** We also note that the principal authority cited by the court was its earlier decision in *Boston Professional Hockey Ass'n Inc. v. Dallas Cap & Emblem Manufacturing, Inc.*, 597 F.2d 71 (5th

Cir.1979). In that case, the court had disapproved enhanced damages based on conduct other than the infringing activity that formed the basis of the complaint. *Id.* at 77.

**15.** *See Roulo*, 886 F.2d at 941 ("Profits are awarded under different rationales including unjust enrichment, deterrence, and compensation."); *Maltina Corp. v. Cawy Bottling Co., Inc.*, 613 F.2d 582, 585 (5th Cir.1980) ("This accounting [of profits] serves two purposes: remedying unjust enrichment and deterring future infringement.").

cause the award seeks to mirror the bargain at which the parties would have arrived had negotiations taken place, it becomes for the malefactor simply the cost of doing business. There is no incentive to engage in protracted, expensive, and perhaps unsuccessful licensing negotiations when the consequence of getting caught for trade piracy is simply to pay what should have been paid earlier. Nunc pro tunc payment of the royalty fee becomes simply the "judicial expense" of doing business. *Playboy*, 692 F.2d at 1275; *cf. Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir.1978) ("[T]he infringer would have nothing to lose and everything to gain if he could count on paying only the normal, routine royalty non-infringers might have paid."). Second, as this case makes very clear, the valuation of a royalty payment is very difficult.[16] As the district court noted, a negotiation for the royalty never took place. The court must review the probable happenings at a hypothetical bargaining table between parties that might well have never chosen to bargain with each other on a voluntary basis. In estimating the probable result of such hypothetical bargaining, the district court must also keep in mind that the information that would have been available to each of the parties, but especially to the victim, is far from clear. The victim's pricing decision would necessarily be influenced by a variety of factors such as other opportunities for the use of the mark. In addition to these ambiguities, the task of the district court can become even more difficult if the information usually relied upon is not available to the district court at the time it must make the calculation. *See Boston Professional Hockey Ass'n Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 597 F.2d 71, 77 (5th Cir.1979) (noting that enhancement might be justified "by the defendant's withholding or misrepresenting" records that make the calculation more difficult).

All of these ambiguities require that, in fashioning relief based on royalty payments, a court take special care to ensure that the royalty payment has not undercompensated the victim. Enhancement of the damages attributable to a lost royalty in order to ensure that the malefactor, and not the victim, bears the burden of any uncertainty in its calculation is a permissible way of achieving that goal. *See Taco Cabana*, 932 F.2d at 1127 (stating that "we have suggested that enhancement could, consistent with the 'principles of equity' promoted in section 35(a), provide proper redress to an otherwise undercompensated plaintiff where imprecise damage calculations fail to do justice"); *Boston Professional Hockey*, 597 F.2d at 77 ("[W]e might agree that increased damages may be justified by defendant's withholding or misrepresenting available sales records, which would have the effect of making much more difficult, if not impossible, plaintiff's proof of damages or profits.").[17] Additionally, in some circumstances, an enhancement might be necessary to ensure that the victim will not once again experience a second loss at the hands of the malefactor. Such an enhancement, made on the basis of specific findings, would not violate the mandate of the statute that the award ought not be punitive.[18]

---

16. As one court has noted in attempting to calculate a royalty in the patent context:

Determination of a "reasonable royalty" after infringement, like many devices in the law, rests on a legal fiction. Created in an effort to "compensate" when profits are not provable, the "reasonable royalty" device conjures a "willing" licensor and licensee, who like Ghosts of Christmas Past, are dimly seen as "negotiating" a "license." There is, of course, no actual willingness on either side, and no license to do anything, the infringer being normally enjoined, as is [the defendant] from further manufacture, use, or sale of the patented product.

*Panduit*, 575 F.2d at 1159.

17. *Cf. Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512 (11th Cir.1990) (upholding a royalty multiplier that had been employed by the district court in a Lanham Act case but in the context of civil contempt; the court noted that both the Lanham Act and the civil contempt sanction share a goal of imposing a remedy that is compensatory and not punitive). *See generally Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 109–112 (2d Cir.1988) (reviewing legislative history of Lanham Act which revealed an intent that "the provision to increase or decrease recovery based on an infringer's profits was simply a recognition of the problems of proof facing plaintiffs"), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989).

18. *See, e.g., Louis Vuitton S.A. v. Lee*, 875 F.2d 584 (7th Cir.1989), in which we stated:

■ In our earlier opinion, we expressed concern that the mere award of a royalty would not be an adequate measure of damages. We noted that it is at best a rough approximation of the plaintiff's loss and therefore well might not compensate the victim fully for its loss. To ensure that any ambiguity with respect to the magnitude of that loss falls on the malefactor's shoulders and not on those of the injured party, the district court clearly had the authority to enhance the award. Indeed, when supported by the evidence, such an enhancement is necessary to deter adequately the wrongdoer.

With respect to the case before us, there is evidence in the record that would support an enhancement of the award on this basis. STW's expert testified to a royalty rate that would have yielded approximately the same figure as that reached by the district court upon its doubling of the royalty. There is also the ambiguity concerning the long-term effect on the mark's value of Quaker's pervasive and prolonged use. *See ALPO Petfoods, Inc. v. Ralston Purina Co.,* 778 F.Supp. 555, 564 (D.D.C.1991) (noting the need to consider "the systemic distortion which the wrongdoer's conduct has upon the particular product market in which the plaintiff must compete in the future"), *aff'd in part,* 997 F.2d 949 (D.C.Cir.1993). We also note that the record discloses that the district court did not have access to data indicating the past practices of Quaker with respect to the payment of royalties. *See Boston Professional Hockey,* 597 F.2d at 77 (suggesting that such action, if properly attributable to the defendant, would also justify enhancement). The issue before us, however, is not whether the record would support such an award but whether the district court intended to impose the enhancement for that reason. It is the district court, not this panel, that has the

right to exercise its discretion in that regard. *Burger King Corp. v. Mason,* 710 F.2d 1480, 1495 (11th Cir.1983) ("This remedial accommodation clearly envisions the exercise of discretion. Consequently, it would be inappropriate for this court to attempt a determination of damages in the first instance."), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984).[19]

■ As we have noted earlier, in making its determination of enhanced damages, the district court made reference to the hypothetical nature of the royalty calculation. We cannot determine, however, whether the entire enhancement was based upon this consideration or on an amorphous concern for deterrence unrelated to the initial calculation of the royalty. In directing the district court to use a royalty figure as a baseline, we contemplated that the enhancement would be tied to that determination. We are also concerned that, in calculating the hypothetical royalty based on the factors enumerated in *Georgia–Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116 (S.D.N.Y.1970), *modified and aff'd,* 446 F.2d 295 (2d Cir.), *cert. denied,* 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971), the district court relied on the same factors both to determine and to enhance the royalty. To the degree that those factors have been considered in the determination of the base figure, they should not be double-counted by using them to calculate an enhancement after they have been used to arrive at the base royalty.

Although we regret the necessity of returning this case to the district court for further proceedings, we believe that it is necessary for the district court to state with more precision the basis for the enhancement. *See ALPO Pet Foods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 970 (D.C.Cir.1990)

Treble damages are a particularly suitable remedy in cases where surreptitious violations are possible, for in such cases simple damages (or profits) will underdeter; the violator will know that he won't be caught every time, and merely confiscating his profits in the cases in which he is caught will leave him without net profits from infringement.

*Id.* at 588 (discussing recovery in a counterfeiting context under § 1117(b)).

19. As we have noted above, although it might also be permissible to impose an enhancement in order to ensure that the plaintiff would not again be the victim of the malefactor's repeated wrongdoing, we do not understand the plaintiff to be urging such a position in this case.

(noting the need for the district court to set out the reasons why the award may be considered compensatory and not punitive). We find ourselves in the same position as our colleagues on the Court of Appeals for the Fifth Circuit in *Boston Professional Hockey.* As Judge Gee wrote on that occasion,

> We do not question the accuracy of the findings of the trial court; we are simply unable to determine from them whether on the facts of this case increased damages should be considered an abuse of discretion as the defendant argues.

*Boston Professional Hockey,* 597 F.2d at 77.

We trust that these proceedings shall be brief and focused and that the parties will cooperate fully with the district court's efforts in this regard. The parties ought not be permitted to reopen any issue already litigated. Indeed, we stress that the only purpose of the remand is to permit the district court to state with more clarity the reasons for the enhancement and to make any alterations in its judgment with respect to the enhancement that may be necessary or appropriate in light of this opinion.

### Conclusion

Accordingly, the judgment of the district court is affirmed in part and vacated in part. The case is remanded for further proceedings in light of this opinion. The parties shall bear their own costs of this appeal.[20]

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

FAIRCHILD, Circuit Judge, concurring.

Awarding to a plaintiff the profits which an infringer has derived from his infringement is contemplated by the statute and by the cases. In *Sands I* Judge Marshall's estimate that 10% of Quaker's profit was attributable to the infringement was not sustained.

We directed an award which would not be simply a percentage of Quaker's profits, which would use a reasonable royalty as a starting point, and which could "take into account the possible need for deterrence, which may involve consideration of the amount of Quaker's profits."

We now approve Judge Marshall's determination of a reasonable royalty. Judge Ripple proposes to remand for a further explanation of the doubling of it. He would remand "to permit the district court to state with more clarity the reasons for the enhancement and to make any alterations in its judgment with respect to enhancement that may be necessary or appropriate in light of this opinion."

I would prefer to affirm because given the history of this case, the purpose of doubling the royalty is sufficiently clear as deterrent, and within the directions we gave in *Sands I.*[1]

One purpose of punishment is deterrence of the actor (as well as others) from future unlawful conduct. But it does not follow that an award for the purpose of deterrence is always a punishment which the penultimate sentence of § 35(a) has been thought to prohibit. The statute itself authorizes the award of profits, and the cases have recognized the legitimate deterrent effect of making infringement unprofitable. *See, e.g., Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931, 941 (7th Cir.1989), *cert. denied,* 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990); *Louis Vuitton S.A. v. Lee,* 875 F.2d 584, 588 (7th Cir.1989); *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738, 744 (7th Cir.1985); *Playboy Enterprises v. Baccarat Clothing Co., Inc.,* 692 F.2d 1272, 1274–1275 (9th Cir.1982) (discussing importance of deterrence in general).

Judge Ripple recognizes that "royalty payments pose difficult problems with respect to the need to ensure that the defendant has been divested of its ill-gotten gain." He also

---

**20.** We find nothing in the district court's opinion that leads us to conclude that reassignment of this case to a new district judge is warranted. *See supra* note 6.

**1.** And, as Judge Ripple acknowledges, "there is evidence in the record that would support an enhancement of the award on this basis [deterrence]."

observes that "[e]nhancement of the damages attributable to a lost royalty in order to ensure that the malefactor, and not the victim, bears the burden of any uncertainty in its calculation is a permissible way of achieving that goal." Finally, Judge Ripple notes that the district court was concerned that the royalty calculation may not fully compensate STW; given this concern, I believe that the district court permissibly used its discretion to enhance the award for deterrent purposes.

With respect, I view further explanation on remand as an unnecessary exercise. Judge Ripple proposes to affirm the judgment insofar as it awarded the amount calculated as a reasonable royalty, interest thereon, and attorney's fees. I concur as does Judge Cudahy. Judge Ripple would remand for certain determinations with respect to enhancement of the award of a reasonable royalty. Judge Cudahy would wholly deny enhancement.

I would deem it appropriate to affirm the entire judgment, including the enhancement, but neither of my colleagues supports that result. Judge Ripple's position is significantly closer to mine, and in order to reach a decision supported by a majority, I concur in Judge Ripple's opinion.

CUDAHY, Circuit Judge, concurring in part and dissenting in part.

I have no real quarrel with the majority's careful examination of the caselaw as it pertains to the somewhat esoteric relation between effecting deterrence and imposing a "penalty." I agree that, if we are to make any sense out of the seemingly inconsistent language of § 35(a), permitting trebled damages but forbidding the imposition of a penalty, enhanced damages should be awarded only where there is reason to believe that the calculation of "actual damages" for some reason fails to fully compensate the plaintiff.

My viewpoint on damages is certainly somewhat colored by my role as author of the opinion on liability in this case. This is a thin case, as I think my opinion for the panel makes clear. In fact, a finding of bad faith was made here only with considerable reluctance. *In re Gioioso,* 979 F.2d 956, 961–63 (3rd Cir.1992) (describing the evidence of bad faith as "pretty slim" and "marginal at best"). The Thirst–Aid mark was essentially a shelf item, attached to no good will of an ongoing business. It was a mark looking for a product and a business which might find it of some value. For a few months in 1980 it was licensed to Pet, Inc. in connection with an isotonic beverage. After a short test the product and the mark were dropped by Pet, and Thirst–Aid went back into storage in search of another ongoing business to which it might attach itself.

The district court has found that Quaker Oats would have paid a reasonable royalty of $10,000,000 for the use of the mark. This is a most generous calculation and, I think, beyond the wildest dreams of STW, which held the mark in its files and had never earned substantial sums from it before. It is an amount based on a rate considerably more liberal than the one negotiated for the brief Pet experiment. Certainly, it is a more than fair measure of damages. But it does have a rational basis and I am prepared to accept it. To *double* it, however, in the name of deterrence is, with great respect, wholly unjustified and an abuse of discretion.

It does not require the shadow of the bankruptcy court or even depressed quarterly earnings to "deter" a big corporation like Quaker Oats. $10,000,000 plus interest and attorneys' fees is an embarrassment to management, probably costs some cents per share in earnings and will be duly noted by the securities analysts and by the trade press.[1] If $10,000,000 is fair compensation, it is an adequate deterrent. This is the as-

---

1. On April 19, 1993, the day the Supreme Court denied the petition for a writ of certiorari from our previous opinion in this case, Quaker Oats' stock fell $.75 a share. *See* Nightly Business Report (April 19, 1993). But pinpointing the causal relationship between a particular event and a change in a stock's price is of course a complex, if not impossible, endeavor as the securities doctrine of loss causation attests.

sumption underlying tort damages in general.

Damages equal to "L" from the Hand formula, see *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir.1947), are compensatory damages, and "optimal deterrence" is achieved when damages are so calculated. One might respond that such a measure of damages is inadequate in the "intentional tort" context. Quaker Oats should not be in a situation where it would just as soon be sued as be asked to negotiate a royalty. In other contexts, the common law of torts has endeavored to address this problem. "[W]e want to make sure that I am not allowed to be indifferent between stealing and buying my neighbor's car. We do this by making the damages award greater than the value of the car so that I do not consider conversion an acceptable substitute for purchase. Punitive damages are one way of doing this. Another way, also common in intentional tort cases, is to make the tortfeasor pay the victim what the thing taken was worth to the tortfeasor. This is the restitutionary measure of damages." Richard A. Posner, *Economic Analysis of the Law* 209 (4th ed. 1992).

The Lanham Act, however, admits of neither of these alternatives. But this possible shortcoming should not detain us in this case, since there is no basis here for the speculation that, if Quaker Oats could negotiate a $10,000,000 royalty, it would just as soon risk a lawsuit in the same amount. Even if there were such a basis, however, under the Lanham Act the two alternatives to compensatory damages, punitive damages and restitution (which in the securities context is called disgorgement) are not available. The prohibition of punitive damages is express. And restitution, a *property* based measure of damages, is inconsistent with the nature of a trademark holder's rights. It must be kept in mind that the underlying purpose of the Lanham Act is consumer protection, and the

damages measure is an effort to estimate the "cost" of the confusion that would be created if Sands Taylor attempted to market an isotonic beverage named "Thirst–Aid," or (more likely) sold the mark to someone who would. We therefore look to a "reasonable royalty" to estimate the harm to the consumer, not to compensate the trademark holder for a "trespass" to its "property." While our concern with "consumer confusion" "may result in the creation of 'quasi-property rights' in communicative symbols, the focus is on the protection of consumers" rather than on the trademark as the holder's "property" per se. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157, 109 S.Ct. 971, 980, 103 L.Ed.2d 118 (1989). The Lanham Act therefore requires damages, even when enhanced, to serve as "compensation," not restitution or "a penalty."

Doubling the $10,000,000 cannot be justified on a "compensatory" basis. Again with great respect for the able trial judge, doubling grossly miscalculates what deterrence requires and imposes an unjustifiable penalty in a situation where it takes a bit of imagination to find bad faith. I see no need to remand for yet another justification of an excessive award. I would let the $10,000,000 plus interest and attorneys' fees stand as a generous calculation of compensation having a quite certain deterrent impact.

I therefore respectfully dissent from the need for further district court consideration.