**A & H SPORTSWEAR CO., INC. & Mainstream Swimsuits, Inc., Plaintiffs and Counterclaim–Defendants,**

v.

**VICTORIA'S SECRET STORES, INC. & Victoria's Secret Catalogue, Inc., Defendants and Counterclaim–Plaintiffs.**

**Civil Action No. 94–7408.**

United States District Court,
E.D. Pennsylvania.

June 27, 1997.

Revised Order July 1, 1997.

---

Arthur Seidel, Stephen J. Meyers, Michael F. Snyder, Philadelphia, PA, for Plaintiffs.

Frank J. Colucci, Richard P. Jacobson, New York City, H. Robert Fiebach, Philadelphia, PA, for Defendants.

## DECISION AND ORDER

VAN ANTWERPEN, District Judge.

## I. BACKGROUND

This action arose under the common law, Sections 32 and 43(a) of the Trademark Act of 1946 (the Lanham Act), 15 U.S.C. § 1114, 1125(a), and the Pennsylvania Antidilution Law, 54 Pa.C.S.A. § 1124. The parties were diverse in citizenship and the amount in controversy exceeded $50,000 exclusive of interests and costs. This court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, 1337, 1338 and 1367. Plaintiffs chose to bring this action directly in district court pursuant to 28 U.S.C. § 1338 rather than through the adjudication of the Patent and Trademark Office. On December 8, 1994, Plaintiffs A & H Sportswear, Inc. and Mainstream Swimsuits, Inc. ("A & H")[1] filed their complaint alleging trademark infringement by Defendants Victoria's Secret Stores, Inc. ("VS Stores") and Victoria's Secret Catalogue, Inc. ("VS Catalogue"). Defendants were alleged to have infringed the Plaintiffs' MIRACLESUIT mark with their The MIRACLE BRA line of products. Pursuant to a telephone conference on June 13, 1995 and an order of June 15, 1995, the parties agreed to consolidate a hearing on a preliminary injunction with a

1. By order of this court on August 2, 1995 Mainstream Swimsuits, Inc. was added as an additional plaintiff.

trial on the merits. We deemed letters from counsel a stipulation waiving a jury trial in our order of July 31, 1995. In our order of October 20, 1995, we granted Defendants' motion for separate trials on the issues of liability and damages. A two-week non-jury civil trial to determine issues of liability was conducted from October 25 to November 3, 1995. Pursuant to Fed.R.Civ.P. 52(a), on May 24, 1996 we made our findings of fact and conclusions of law on the issue of liability. *A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.*, 926 F.Supp. 1233, 1234–35 (E.D.Pa.1996).

We concluded as a matter of law that Plaintiffs had not met their burden of establishing a likelihood of confusion under the applicable legal doctrines summarized in *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225 (3d Cir.1978) and its progeny. *A & H Sportswear*, 926 F.Supp. at 1269. Likewise, we found that Defendants had not violated the Pennsylvania Antidilution statute, 54 Pa.C.S.A. § 1124. *Id.* We concluded that Plaintiffs had met their burden of establishing a possibility of confusion under *Country Floors, Inc. v. A Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1058 (3d Cir.1991) and *Merchant & Evans v. Roosevelt Bldg. Products*, 963 F.2d 628, 637 (3d Cir.1992) between THE MIRACLE BRA and the MIRACLESUIT trademarks in the swimwear market. *A & H Sportswear*, 926 F.Supp. at 1269.

The opinion in *A & H Sportswear* also made or supports the following findings, which we reiterate here:

1. Plaintiffs acted promptly in bringing suit upon Defendants' extension of their trademark into swimwear. THE MIRACLE BRA Bikini first entered VS Catalogue's assortment in the Resort '95 Catalogue edition which was mailed in November 1994. *A & H Sportswear*, 926 F.Supp. at 1243 (citing Finding of Fact No. 33). Plaintiffs filed suit on December 8, 1994. Thus, Plaintiffs had been aware of Defendants' use of THE MIRACLE BRA for use with swimsuits for approximately one month when this complaint was filed. *A & H Sportswear*, 926 F.Supp. at 1254 (citing Finding of Fact No. 74).

2. Plaintiffs did not prove that Defendants acted in bad faith or illegitimately. We made this finding at least three times in our prior opinion. First, we found that Defendants' actions with respect to Plaintiffs' MIRACLESUIT were not willfully tortious. We noted that instead, "these actions at most amounted to a 'decision to take the risk of coming very close to infringement, for the sake of a trade name defendant evidently believed would be more valuable to it than any of the available alternatives.'" *A & H Sportswear*, 926 F.Supp. at 1255 (citing *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 315 F.Supp. 45, 52 (S.D.N.Y.1970), *aff'd*, 437 F.2d 566 (2nd Cir.1971)). Second, we noted that neither bad faith nor deliberate intent had been shown because Defendants did not intentionally choose the name "miracle" for use with bras to ride on the success of Plaintiffs' MIRACLESUIT swimsuit but had conceived of their name independently. *A & H Sportswear*, 926 F.Supp. at 1261 (citing Finding of Fact 23). Finally, we found that while Defendants had constructive notice from the trademark register and actual notice from their trademark searches of Plaintiffs' mark in the swimwear industry, Defendants' choice to extend THE MIRACLE BRA to swimwear (an area already occupied by Plaintiffs) for the purposes of the Lanham Act and the "possibility of confusion" standard were not illegitimate. We reiterated that Plaintiffs had not proven bad faith or illegitimacy. *A & H Sportswear*, 926 F.Supp. at 1267–68, Findings of Fact No. 1, 21, 25, 32–34. We will not find that Defendants have been unjustly enriched.

3. Plaintiffs presented evidence of only a few incidents of actual confusion which we did not find completely credible. There were only a "few incidents" of actual confusion which occurred two months following Defendants' extension of THE MIRACLE BRA to swimwear. *A & H Sportswear*, 926 F.Supp. at 1260, 1263–64, Findings of Fact No. 71–72. A majority of these incidents involved professional swimwear buyers who ordinarily are held to a higher standard of care. We stated that those incidents as related to the Court apparently did confuse the maker of THE MIRACLE BRA with the manufacturer of the MIRACLESUIT. However, we re-

frained from finding that the incidents of confusion actually occurred: "While the incidents testified to probably did occur, their second hand accounting must be carefully scrutinized. The potential to inflict substantial harm on a successful product line by uncorroborated if believable accounts compels us to be vigilant in holding Plaintiff to its ultimate burden of proof." *Id.* at 1262–63.

4. Both the MIRACLESUIT and THE MIRACLE BRA trademarks are strong in their respective industries (swimsuits and lingerie, respectively), but the strength of their marks and the amount of protection they receive commensurately decreases when they extend into the industry dominated by the other. *A & H Sportswear*, 926 F.Supp. at 1263.

5. The MIRACLESUIT is targeted to a consumer pool similar to Defendants' products. *A & H Sportswear*, 926 F.Supp. at 1263.

6. Both parties engaged in substantial promotion activities which undoubtedly resulted in increased public recognition for the respective products. *A & H Sportswear*, 926 F.Supp. at 1257.

7. Although the VS Catalogue is carefully reviewed, in the past there have been references to the "Miracle Bikini" and the "Miracle Bodysuit" which omitted the word "bra." The Defendants' mark is often used without "THE" if to do so would read awkwardly or be grammatically improper. *A & H Sportswear*, 926 F.Supp. at 1258.

8. Plaintiffs were willing to give Defendant VS Catalogue at least a 2% and probably a 6% discount on Plaintiffs' MIRACLESUIT swimwear for Plaintiffs' mark to appear in Defendant VS Catalogue's catalog. In prior negotiations between Defendant VS Catalogue and Plaintiffs, Plaintiffs had agreed to pay Defendant VS Catalogue a 2% advertising fee over the standard 4% for the appearance of the MIRACLESUIT mark in the catalog. This two percent was refunded when the MIRACLESUIT mark

did not appear in the Catalog. Plaintiffs' witness Mr. Mark Waldman had testified that he believed the standard 4% discount Defendant VS Catalogue had first received was in consideration for the appearance of the MIRACLESUIT trademark in the Catalogue. *A & H Sportswear*, 926 F.Supp. at 1242–43.

9. The parties' swimwear is comparably priced. The MIRACLESUIT normally retails in the range of $54.00 to more than $100. Defendants retail THE MIRACLE BRA Bikini at a cost of $69.00 for the top and $29.00 for the bottom and THE MIRACLE BRA Maillot (one-piece) for $69.00. *A & H Sportswear*, 926 F.Supp. at 1238.

## II. FINDINGS OF FACT[2]

### A. *Success of THE MIRACLE BRA Swimwear*

1. The financial information provided by VS Catalogue and VS Stores, in particular, Defendants' Exhibits 285, 286, 287 and 82, are true and accurate representations by these entities of their respective sales and expenses related to THE MIRACLE BRA swimwear, and the information provided by such exhibits consists of actual business records of both Defendants which they rely upon in the regular and ordinary course of their businesses. (11/5 at 4–8; Fisher); (11/5 at 33, 42; Joyce).

2. Defendants' net sales for THE MIRACLE BRA swimsuits are $28.753 million. This figure has not been disputed. (Pls.' Ex. 413; 11/4 at 44–45); (Victoria's Secret's Resp. to A & H's Proposed Findings of Fact at ¶ 1); (Victoria's Secret's Proposed Findings of Fact at ¶ 1). The net sales during this period were $27.166 million and $1.587 million for VS Catalogue and VS Stores, respectively. (Pls.' Ex. 413 at 5–6).

3. The costs properly deductible from Defendants' net sales are those variable costs directly related to the sale or manufacture of the products in issue.[3] This account-

---

**2.** Transcript citations are to the date of the testimony, either November 4 ("11/4") or November 5 ("11/5"), followed by the page number of the transcript and the identity of the speaker.

**3.** In calculating profits, Defendants must prove all elements of cost or deduction claimed. 15 U.S.C. § 1117; *Williamson–Dickie Mfg. Co. v. Davis Mfg. Co.*, 251 F.2d 924, 927 (3d Cir.1958).

ing approach is appropriate in view of the Defendants' size, the $1 billion in assets of Defendants' parent company, annual sales for Defendants' parent company of over $2 billion (including $1.286 billion for VS Stores and $661 million for VS Catalogue in 1995), and the fact that the sale of THE MIRACLE BRA swimwear has never accounted for more than 5% of either Defendants' total sales. (11/4 at 34–36, 40–42, 105–106; Newman); (11/5 at 14–15; Fisher); (Pls.' Ex. 410); (Victoria's Secret's Response to A & H's Proposed Findings of Fact at ¶ 3). In calculating Defendants' profits on THE MIRACLE BRA swimwear, fixed cost items such as overhead are not appropriate deductions from Defendants' revenues because these costs would have been incurred even if Defendants had not sold "THE MIRACLE BRA" swimwear.[4] (11/4 at 49–50, 52–53; Newman).

■ 4. The costs properly deductible from Defendant VS Catalogue's sales are $17.585 million. The costs properly deductible from Defendant VS Store's sales are $703,000. (Pls.' Ex. 416); (11/4 at 45–46; Newman). Thus, VS Catalogue's profits on THE MIRACLE BRA swimwear are $9.581 million and VS Store's profits are $884,000, for an aggregate total of $10,465 million. (Pls.' Ex. 413); (11/4 at 45–46; Newman). These profits were calculated without taking a deduction for taxes to prevent the infringer from obtaining a double benefit.[5] (11/4 at 41, 50–52; Newman).

5. The Defendants calculated profits using the full absorption method for a profit of $3,958,249 for VS Catalogue and a net loss of $29,144 for VS Stores. (Defs.' Ex. 290, Exhibits I and III); (11/5 at 60, 62–65; Hoeberlein). We reject these calculations because we do not believe that the volume of MIRACLE BRA Swimwear sales as a percentage of either Defendants' total sales was significant for the purpose of using the full absorption method.

6. Sales of THE MIRACLE BRA swimwear account for 3% of VS Catalogue's overall profits on an annual basis and more than 5% of its overall profits in its most recent selling season, namely, Spring, 1996. (11/5 at 14–15; Fisher). For VS Catalogue, very few items or collections reach 3% of total sales. The only other items or collections above 3% of gross sales have been THE MIRACLE BRA itself and the London Jean Collection. (11/5 at 15–16; Fisher); (*See* Defs.' Ex. 286). The sales of THE MIRACLE BRA bikini have continued to increase. (11/5 at 113; Fedus).

7. Plaintiffs assert that "defendants' officers have previously testified that defendants could easily dispense with 'THE MIRACLE BRA' swimwear line. (Fedus Dep. 08/09/95, p. 107, 1.21–p. 108, 1. 12.)" and that "VS Catalogue's Chief Financial Officer stated that 'THE MIRACLE BRA' swimwear line was not material or significant. Fiser Dep., 11/5/96, p. 24, 1.8—p. 25, 1. 23." Plaintiffs have not presented us with a copy of this deposition testimony dated more than a year before our hearing on damages, nor have they asserted that or pointed to any place in the trial transcript where they have cross examined Defendants' officers on these statements. We have found the testimony of VS Catalogue's President to be particularly credible throughout these proceedings and the strength of her testimony has played a large role in our decision in this case. Accordingly, we will not find that Defendants can easily dispense with THE MIRACLE BRA swimwear line or that THE MIRACLE BRA swimwear line is not material or significant to them.

8. As conceded by VS Catalogue's President Ms. Fedus, THE MIRACLE BRA name is critical to the success of THE MIRACLE BRA swimsuit. (11/5 at 118–121; Fedus); (Pls.' Proposed Findings of Fact at ¶ 6). Ms. Fedus testified that she thinks the continued sales success of THE MIRACLE BRA swimsuits is connected to the continued sales success of THE MIRACLE BRA lin-

---

**4.** Plaintiffs' expert's methodology follows the law of the Third Circuit under *Century Distilling Co. v. Continental Distilling Corp.*, 205 F.2d 140 (3d Cir.), *cert. denied*, 346 U.S. 900, 74 S.Ct. 226, 98 L.Ed. 400 (1953).

**5.** *See Century Distilling Co.*, 205 F.2d at 148. The Defendants' expert deducted taxes in making its calculations; we reject his figures.

gerie. She testified that THE MIRACLE BRA is not headed down in popularity and that if anything it's popularity is probably accelerating. (11/5 at 113–114; Fedus). She linked the success of her company with bras and panties under THE MIRACLE BRA name to the success of swimwear under the same name because of the similarity in construction between lingerie and swimwear. (11/5 at 115; Fedus).

9. However, in Ms. Fedus's August 1995 deposition she testified that in her opinion "the Miracle Bra . . . has passed its apex and is now heading down." (11/5 at 120; Fedus). She also stated at that time that a good mark on an item people do not want will not make it popular. (11/5 at 10–21; Fedus). We do not think that these deposition statements undercut her most recent testimony which we continue to credit.

10. THE MIRACLE BRA swimwear leverages on the success of THE MIRACLE BRA (bra). (11/5 at 22; Fisher). Plaintiffs' witness Bruce Waldman admitted on recross that "definitely a factor" in the success of THE MIRACLE BRA for swimwear was that Defendants had established THE MIRACLE BRA for bras. (11/4 at 137; Waldman).

11. While it is true that in deposition testimony from August of 1995 Ms. Fedus stated that the loss of THE MIRACLE BRA trademark might have no effect, we believe there is more than adequate support in the record for our finding that THE MIRACLE BRA swimwear has enabled VS Catalogue to position itself as the leading mail-order retailer of swimwear, holding almost 40% of the market. (11/5 at 117; Fedus); (See 11/5 at 119–121). At this time an injunction prohibiting VS Catalogue from selling swimwear using THE MIRACLE BRA trademark would have a significant adverse impact not only on the profitability of VS Catalogue, but also would be extremely detrimental to VS Catalogue's overall swimwear business since THE MIRACLE BRA swimwear comprises more than one-third of its total sales of swimwear. (11/5 at 21–23; Fisher); (11/5 at 115–117, 175–76; Fedus).

## B. *Reasonable Royalty*

12. Plaintiffs' financial expert Glenn Newman calculated a reasonable royalty of 6%. He multiplied this 6% figure by Defendants' THE MIRACLE BRA swimsuit's net sales of $28.753 million (See Findings of Fact, *supra*, No. 2) for a reasonable royalty total of $1,725,000. The 6% figure was based on "historical license agreements negotiated by A & H, the levels of profitability, industry data, the competitive nature of the parties, the plaintiff's unwillingness to negotiate a license of the 'Miraclesuit' trademark, and other factors." Plaintiffs also presented a copy of an article summarizing various royalty and licensing amounts showing that the average "fashion" industry royalty rates for 1994 and 1995 were 6.0% and 7.4% respectively. The royalty range in this category was 5 to 10%. Newman did not have the article when making his report but he testified that the article corroborated his own calculations. Newman testified regarding this report. (Pls.' Ex. 413 at 6); (11/4 at 55–57, 62–63; Newman); (Pls.' Ex. 416).

13. Plaintiffs' principals considered Newman's estimate of a 6% reasonable royalty overly conservative; they advised him that A & H would have demanded a royalty far higher than 6% to license the MIRACLESUIT mark to Defendants for THE MIRACLE BRA swimsuits. A & H was concerned about unwanted competition for A & H's own MIRACLESUIT swimsuits that such a license would engender. (11/4, at 63–64, 114–116; Waldman); (Victoria's Secret's Response to A & H's Proposed Findings of Fact at ¶ 9). Plaintiffs do not have a history of licensing the MIRACLESUIT product. (11/4 at 60; Newman).

14. Defendants' financial expert Wayne A. Hoeberlein calculated a reasonable royalty of 1.7% by applying the ratio of THE MIRACLE BRA swimwear sales over total sales of all THE MIRACLE BRA products to Plaintiffs' expert's 6% theoretical reasonable royalty rate. (Defs.' Ex. 290 at 4); (11/5 at 70–71; Hoeberlein). Hoeberlein also disputed the 6% royalty rate primarily because (1) he did not think Plaintiffs' other licensing agreements were comparable to licensing the MIRACLESUIT brand because the other

marks such as Garfield and the Jetsons had gained wide recognition through other forms of media and (2) he believed that Plaintiffs' MIRACLESUIT mark had no practical value to Defendants since Defendants would be using THE MIRACLE BRA mark. (11/5 at 67; Hoeberlein); (Defs.' Ex. 290); (*See* Pls.' Ex. 314).

### C. *Harm to Plaintiffs*

15. Plaintiffs failed to offer any evidence of lost profits or other direct pecuniary harm proximately caused by Defendants' use of THE MIRACLE BRA on swimwear. (11/4 at 120, 134; B. Waldman). In fact, Plaintiffs' sales of its MIRACLESUIT swimwear have increased since Defendants' sales of THE MIRACLE BRA swimwear began. *A & H Sportswear Co*, 926 F.Supp. at 1252.

16. Plaintiffs' witness Bruce Waldman testified that Plaintiffs would not be inclined to grant a royalty to Defendants but if they were "they certainly would want a lot higher rate than 6%." (11/4 at 112; B. Waldman). Mr. Waldman testified that the reasons he is not inclined to permit a license is that he believes there would be (1) two swimsuits in the market using "Miracle," by two different companies; (2) loss of control by A & H over its MIRACLESUIT mark and reputation; and (3) loss of control over the quality of swimsuits sold under a similar mark. (11/4 at 112; B. Waldman).

17. Waldman was also concerned that the returned merchandise rates for THE MIRACLE BRA swimsuits in VS Catalogue were between about 30% for Spring and 50% for fall. (11/4 at 112, 114–15; B. Waldman); (Pls.' Ex. 408). He testified that the returned merchandise rate of MIRACLESUIT swimsuits sold in stores was under 5%. (11/4 at 117, 130; B. Waldman). Waldman testified on cross examination that the average returned merchandise rate in the industry with respect to catalog swimwear in general was 20% and under 5% with respect to swimwear sold in retail stores. (11/4 at 130–131; Waldman). He also testified on cross examination that he had not heard any bad things about THE MIRACLE BRA swimsuit. (11/4 at 133; B. Waldman). Waldman also testified that the current maker of THE MIRACLE BRA swimwear, Cole of California as purchased by Authentic Fitness, was a reputable and substantial company. (11/4 132–33; B. Waldman). However, Defendant VS Catalogue has had a very liberal returns policy: a no questions asked, ironclad guarantee that has permitted customers to return swimsuits at the end of a season. (11/5 at 18; Fisher). VS Catalogue's President testified that returned merchandise rates were high for swimwear because a woman judges swimsuits by a higher standard because the swimsuit is the only thing between her and the public. (11/5 at 115; Fedus).

18. The inferior quality of THE MIRACLE BRA swimwear compared to the MIRACLESUIT has not been established since customers return swimsuits for a variety of reasons other than quality. (11/4 at 131–133; B. Waldman). Since the VS Catalogue consumer does not have the opportunity to try on the swimsuit prior to purchase, the returned merchandise rate may reasonably be higher than for a retail store. (11/5 at 18; Fisher); (11/5 at 115; Fedus). However, it is reasonable to attribute some significant portion of Defendants' returned merchandise to the quality of the products. (11/4 at 114, 116–17; B. Waldman); (Pls.' Resp. to Defs.' Proposed Findings of Fact at ¶ 3).

### D. *Defendants' Disclaimer*

19. Bruce Waldman testified that a disclaimer that appeared in a recent Victoria's Secret Catalogue after liability was found was too small, gave the appearance that the MIRACLESUIT is the imitator, was unlikely to decrease confusion, and could require him to come to court again to litigate whether the disclaimer is big enough, small enough, and frequent enough. (11/4 at 122–125, 138; B. Waldman); (*See* Pls.' Ex. 414). We do not credit his testimony that the disclaimer is too small or is unlikely to decrease confusion. In addition, we believe that an appropriate order by this court will not require Plaintiffs to come to court frequently to litigate the size and frequency of a disclaimer.

20. VS Catalogue and VS Stores has had prior experience with consumer research at point of sale, but has not conducted any studies on the effectiveness of disclaimers.

Nevertheless, VS Store's Vice President of Marketing Carol Mabe was sure that her staff could create copy that would satisfy all objections. (11/5 at 48–51; Mabe).

21. VS Catalogue's president Ms. Fedus agreed that a message would most effectively be conveyed by the large banner sized type used at the top of the layout. (11/5 at 127–128; Fedus). In discussing the catalog itself, Fedus also testified that there are only a very few seconds in which to capture a consumer's attention, so placement near the telephone number is particularly appropriate. (11/5 at 111–12; Fedus).

22. Ms. Fedus conceded that although her team is committed to publishing without error, mistakes do occur in the publication of the catalog. (11/5 at 145–48; Fedus). She also testified that she did not think it would be fair to the Plaintiffs to have to come into court every time a disclaimer fails to run and reapply for relief. (11/5 at 148; Fedus); (Defendants, Response to Plaintiffs, Proposed Findings of Fact at ¶ 18). However, she doubted that the disclaimer would be omitted given the high level involvement of Defendants' management in this litigation. (11/5 at 154; Fedus). Ms. Fedus admitted that she would not know how to control editorial content concerning THE MIRACLE BRA swimwear outside the confines of VS Catalogue's catalog. (11/5 at 154–56; Fedus). However, she also testified that VS Catalogue does not reach out for editorial coverage, does not produce press kits, and that the only advertising she does is the catalog. (11/5 at 157; Fedus).[6] Ms. Fedus also acknowledged that a disclaimer in the catalog would not be effective for women unless they picked up and looked at a VS Catalogue. (11/5 at 161; Fedus). She also admitted that Defendants' disclaimer could not eliminate confusion if a consumer saw a MIRACLESUIT display at a retail store; she noted, however, that Plaintiffs would be free to implement their own disclaimer. (11/5 at 158–60; Fedus).

23. Defendant VS Catalogue presented the disclaimer: "The Miracle Bra swimwear collection is exclusive to Victoria's Secret and not associated with MIRACLE-SUIT® by Swim Shaper®" published in the Victoria Secret's Resort 1997 Catalogue. Ms. Fedus testified that the statement is true, accurate, and effective in eliminating the possibility of confusion. (11/5 at 134, 170–172, 174; Fedus); (Defs.' Ex. 296). She testified that she thought the disclaimer was prepared jointly by trademark counsel and the copy writing team at VS Catalogue. (11/5 at 112; Fedus).

24. This disclaimer appeared in dark, black type against a light background at the lower left corner of the actual page on which TIF MIRACLE BRA Swimwear Collection was featured in the catalog, just above the telephone number for placing an order. It was legible. VS Catalogue receives approximately 80% of its orders by telephone. (11/5 at 111–113; Fedus); (Defs.' Ex. 296). Ms. Fedus testified that since in her experience a customer does not read the copy unless the photograph intrigues her, the position of the disclaimer near the phone number is most appropriate rather than placed within the copy on the facing page. (11/5 at 112–113; Fedus). Ms. Fedus also testified that her company can follow whatever instructions this Court may issue with respect to a disclaimer. However, Ms. Fedus testified that currently there are no written instructions concerning a disclaimer nor are their any instructions concerning what will occur to an employee if they fail to run a disclaimer. (11/5 147–148; Fedus).

25. However, in a version of the Spring 1997 Catalogue and the 1997 Semi–Annual Sale Catalogue the disclaimer has not always appeared near the phone number nor set apart nor on every page where THE MIRA-CLE BRA bikini is displayed. The same wording was used. (A & H's Reply to Defs.' Post–Trial Br. Ex. A & B). We do not find

---

6. However, VS Catalogue's Executive Vice President and Chief Financial Officer Henry Fisher testified that he believed VS Catalogue advertises THE MIRACLE BRA swimwear collection in three different space ads or magazine ads, probably directed at the Canadian market. (11/5 at 16; Fisher). We do not believe that this testimony undermines Ms. Fedus's own testimony, the substance of which was that the only significant advertising of THE MIRACLE BRA swimwear is done in the catalog itself. The citations to the record in Plaintiffs' brief support this conclusion. (Pls.' Post–Trial Mem. of Law at 26–27).

these disclaimers to be patently inadequate. This information was presented to this court after the close of evidence and we will not consider it. Even if we did, it would not change our decision in this case.

26. Mr. Fisher testified that during the twelve-month period beginning in November, 1996, the disclaimer in Finding of Fact No. 23 would appear in at least 145 million to in excess of 220 million catalogs distributed throughout the United States. (11/5 at 19–21; Fisher); (Defs.' Ex. 288).

27. VS Stores has not marketed swimwear in approximately 1 1/2 years and has no plans to market swimwear in 1997. However, if VS Stores decides to reintroduce THE MIRACLE BRA swimwear in the future, it has agreed to incorporate the aforesaid disclaimer on the product hangtag. (11/5 at 44–46; Mabe).

## III. DISCUSSION

### A. *General Legal Standards* [7]

Plaintiffs only proved a possibility of confusion at the liability portion of trial in this case. As we noted in our opinion following the liability phase of trial, the Third Circuit has expressly held that a possibility of confusion can exist independently of a likelihood of confusion. *A & H Sportswear*, 926 F.Supp. at 1265.

However, in determining Plaintiffs' appropriate relief we face an issue of first impression. Third Circuit cases on the possibility of confusion standard have not provided detailed guidance as to the appropriate remedy after a trial on the merits. *Versa Prods. Co. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189 (3d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 54, 133 L.Ed.2d 19 (1995); *Country Floors*, 930 F.2d 1056; *Merchant & Evans*, 963 F.2d 628.

Similarly, district courts within the Third Circuit typically have found both a likelihood of *and* a possibility of confusion or no liability

at all. *See, e.g., Sweetzel, Inc. v. Hawk Hill Cookies, Inc.*, 39 U.S.P.Q.2d 1258, 1995 WL 550585 (E.D.Pa.1995) (after analysis of *Scott* factors, district court found neither possibility nor likelihood of confusion); *Rockland Mortgage Corp. v. Shareholders Funding, Inc.*, 835 F.Supp. 182, 191 n. 15 (D.Del.1993) ("In this case, the Court does not decide whether five years constitutes long established,' for the Court finds a likelihood of confusion, not a mere possibility of confusion, between the marks of the parties."); *National ICEE Corp. v. J & J Snack Foods, Corp.*, 22 U.S.P.Q.2d 1783, 1992 WL 70396 (E.D.Pa. 1992) (finding both possibility and likelihood of confusion); *Barre–National, Inc. v. Barr Labs., Inc.*, 773 F.Supp. 735, 740–41 (D.N.J. 1991) (acknowledging possibility of confusion standard but declining to apply it); *Dominion Bankshares Corp. v. Devon Holding Co.*, 690 F.Supp. 338, 345 (E.D.Pa.1988) (finding both possibility and likelihood of confusion); *Blumenfeld Development Corp. v. Carnival Cruise Lines*, 669 F.Supp. 1297, 1320 (E.D.Pa.1987) (acknowledging possibility of confusion standard but basing finding on likelihood of confusion).

In two recent opinions, the district courts within the Third Circuit again noted the existence of the possibility of confusion analysis, but declined to apply it. *Genovese Drug Stores, Inc. v. TGC Stores, Inc.*, 939 F.Supp. 340, 345 (D.N.J.1996); *The Guardian Life Ins. Co. of America v. American Guardian Life Assurance Co.*, 943 F.Supp. 509, 521 n. 8 (E.D.Pa.1996).

Without such guidance, we take as our starting point the statutory language of the remedies provisions in the Trademark Act of 1946 (the Lanham Act), 15 U.S.C. §§ 1116, 1117. The Lanham Act has two major remedies provisions, one providing for injunctive relief and the other providing for monetary relief.

The Lanham Act § 34(a), 15 U.S.C. § 1116(a) deals with injunctive relief:

---

7. Unless otherwise noted in this opinion, to the extent that any common law claims still exist based on § 1126 of the Pennsylvania Trademark Act, 54 Pa.Stat.Ann. §§ 1101–26 or other applicable provision, we will not discuss them separately as the elements under Pennsylvania common law and the Lanham Act appear to be sufficiently identical to permit us to restrict our discussion to Plaintiffs' federal claims. *See Standard Terry Mills, Inc. v. Shen Manufacturing Co.*, 803 F.2d 778, 780 n. 4 (3d Cir.1986).

(a) Jurisdiction; service. The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, **according to the principles of equity** and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office. . . .

[emphasis added].

The Lanham Act § 35(a), 15 U.S.C. § 1117(a) deals with monetary relief, outlining the remedies of an accounting of profits, damages, and an award of costs:

(a) Profits; damages and costs; attorney fees. When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 1125(a) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of section 1111 and 1114 of this title **and subject to the principles of equity**, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, **according to the circumstances of the case,** for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

[emphasis added].

■ Both statutes clearly point out that remedies for trademark infringement are subject to the principles of equity; therefore, we believe equity should be the key consideration in determining which remedies to award in a case where only a possibility of confusion has been shown. One such equitable consideration is the relative adequacy to the plaintiff of other remedies. *Restatement (Third) of Unfair Competition* §§ 35(2)(c), 36(3)(b), 37(2)(b). Thus, while we will begin our discussion of remedies with injunctive relief, this analysis will not take place in a vacuum. Throughout both discussions we bear in mind that the guiding principle of equity is the ability of the court to mold each decree to the necessities of a particular case; flexibility, not rigidity, is the distinguishing feature. *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944).

## B. *Injunctive Relief Generally*

■ Once infringement is found, the court, using the principles of equity must consider the appropriateness and scope of injunctive relief. "In deciding whether a permanent injunction should be issued, the court must determine if the plaintiff has actually succeeded on the merits (i.e. met its burden of proof). If so, the court must then consider the appropriate remedy." *CIBA–GEIGY Corp. v. Bolar Pharmaceutical Co., Inc.,* 747 F.2d 844 (3d Cir.1984) (citing *Evans v. Buchanan,* 555 F.2d 373 (3d Cir.), *cert. denied,* 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977)), *cert. denied,* 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985). As noted in the Restatement (Third) of Unfair Competition:

The appropriateness and scope of injunctive relief depend upon a comparative appraisal of all the factors of the case, including the following primary factors:

(a) the nature of the interest to be protected;

(b) the nature and extent of the wrongful conduct;

(c) the relative adequacy to the plaintiff of an injunction and of other remedies;

(d) the relative harm likely to result to the legitimate interests of the defendant if an injunction is granted and to the legitimate

interests of the plaintiff if an injunction is denied;

(e) the interests of third persons and of the public;

(f) any unreasonable delay by the plaintiff in bringing suit or otherwise asserting its rights;

(g) any related misconduct on the part of the plaintiff; and

(h) the practicality of framing and enforcing the injunction.

*Restatement (Third) of Unfair Competition* § 35.

■ Under certain rare circumstances, no injunction at all may be appropriate. "[I]f the plaintiff's interest is not substantial in comparison with the legitimate interests of the defendant and the defendant's conduct was undertaken in good faith, the balance of equities may not justify injunctive relief." *Restatement (Third) of Unfair Competition* § 35, comment (b).

This situation in which no injunctive relief at all is issued should be distinguished from a situation in which some injunctive relief is appropriate but the scope of that relief does not amount to a complete prohibition of the use of the mark. The court has broad power in fashioning an appropriate remedy:

In exercising this equitable power, courts may tailor appropriate relief to the particular facts and circumstances of each case, ranging from an order requiring the defendant to cease use of the infringing mark altogether, see e.g., *Baglin v. Cusenier Co.*, 221 U.S. 580, 31 S.Ct. 669, 55 L.Ed. 863 ([1911] 1991), or to take affirmative actions to disassociate itself from the mark owner, see, e.g., *Grenadier Corp. v. Grenadier Realty Corp.*, 568 F.Supp. 502 (S.D.N.Y.1983), to orders permitting the defendant to use a distinctive logo form of the infringing mark, see, e.g., *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), or to advertise its former affiliation with the plaintiff. See, e.g. *Professional Golfers Ass'n [v.] Bankers Life & Casualty Co.*, 514 F.2d 665 (5th Cir. [1975] 1995). The ability of the federal courts to enjoin infringing uses extends to the power to issue injunctions against a resumption of

discontinued infringement. See, e.g., *Heaton Distrib. Co. v. Union Tank Car Co.*, 387 F.2d 477 (8th Cir.1967).

Virginia S. Taylor & Theodore H. Davis, Jr., *Enforcement of Trademark Rights: Patent and Trademark Office Proceedings, Suits for Infringement in Federal Court, and Preliminary Injunctions*, C602 ALI–ABA 111, at 164 (1991). *Accord Evans v. Buchanan*, 555 F.2d at 378.

■ The fact that only a possibility of confusion has been proven in this case will have a great impact on the scope of injunctive relief, should this court determine that some form of injunctive relief is appropriate. " 'As with any equity case, the nature of the violation determines the scope of the remedy.' " *Evans v. Buchanan*, 555 F.2d at 380 (constitutional rights case) (quoting *Swann v. Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971)). In trademark infringement actions, prevention of a likelihood of confusion determines the appropriate scope of injunctive relief. *Restatement (Third) of Unfair Competition* § 35, comment (c) (*See e.g., Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467 (3d Cir.1990) (injunction prohibiting use limited to products likely to cause confusion); *Holiday Inns of America, Inc. v. B & B Corp.*, 409 F.2d 614 (3d Cir.1969)). Thus, when a court perceives a great likelihood of confusion, as when an infringer uses the exact trademark, a narrow injunction permitting continued use of an incontestable trademark is an abuse of discretion. *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 141–42 (3d Cir.1981). Similarly, a disclaimer disaffirming any connection with plaintiff may be proper where the evidence shows a potential for confusion, not a substantial likelihood of confusion. *WAWA, Inc. v. Commons at WAWA, Inc.*, No. CIV. OA.89–4554, 1990 WL 52550, at *1 (E.D.Pa. 1990) (Pollack, J.). *See also Soltex Polymer Corp. v. Fortex Industries, Inc.*, 832 F.2d 1325, 1329 (2d Cir.1987).

■ Uncertainties regarding the scope of injunctive relief are typically resolved against the wrongdoer. *Restatement (Third) of Unfair Competition* § 35, comment (c) (citing *Champion Spark Plug Co. v. Sanders*, 331

U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947)). "However, an injunction should not prohibit legitimate competitive activities." *Id.* (citing *B.H. Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d 1254 (5th Cir.1971) ("[R]elief should be 'only that which is required to distinguish the two products, and no more.'")). "In granting injunctive relief, the court's remedy should be *no broader than necessary* to provide full relief to the aggrieved plaintiff." *McLendon v. Continental Can Co.,* 908 F.2d 1171, 1182 (3d Cir. 1990); *Soltex,* 832 F.2d at 1329 (quoting *Swann,* 402 U.S. at 16, 91 S.Ct. at 1276 (1971)) (nature of violation determines scope of equitable remedy).

■ We believe that the appropriate relief in this case is an injunction requiring that Defendants be prohibited from using THE MIRACLE BRA trademark with respect to swimwear unless (1) Defendants use a disclaimer and (2) Defendants pay Plaintiffs a reasonable royalty. As explained below, we believe that this resolution, although falling short of a full permanent injunction prohibiting Defendants from using a "miracle" mark with respect to swimwear, is the most equitable resolution of this case. We begin with our discussion of why a disclaimer is more appropriate relief in this case than a full permanent injunction prohibiting use of a "miracle" mark with regard to swimwear. We believe our discussion of conditioning future use on a "miracle" mark on the payment of a reasonable remedy will be better understood in this context.

### C. *Disclaimers*

### 1. Nature of the protected interest

■ We begin with the nature of the interest to be protected in this case. First, Plaintiffs' interest is circumscribed because at the time they filed this suit Plaintiffs did not have a significant interest in extending their product line. *See A & H Sportswear,* 926 F.Supp. at 1238, 1263 (strength of parties' marks and amount of protection they receive commensurately decreases when they extend into the industry dominated by the other; Plaintiffs have not extended the MIRACLE-SUIT or SWIMSHAPER marks into the lingerie market). Similarly, Plaintiffs have submitted no evidence that they intended to extend their product line at the time this suit commenced. We weigh this factor against the grant of a permanent injunction prohibiting Defendants from using a "miracle" mark for swimwear. *See Restatement (Third) of Unfair Competition* § 35, comment (c) ("[T]he court may also consider the extent to which the Plaintiff has invested in planned expansion under the mark into other products or other geographic markets.")

■ Next, because Plaintiffs have proven no direct diversion of sales, only a possibility of confusion, and only a possibility of harm to reputation and goodwill, a full permanent injunction prohibiting use is a less appropriate remedy for Plaintiffs' interests than a disclaimer. As we noted during the liability phase of the trial this court was able to find a possibility of confusion between the MIRACLESUIT and THE MIRACLE BRA swimwear because Defendants had extended their mark into the same market occupied by Plaintiffs. *A & H Sportswear,* 926 F.Supp. at 1265–69. We noted that while both swimsuits had varying functions, a possibility of confusion might still exist because customers may be confused as to the source of the products, rather than as to the products themselves. Thus, the interest Plaintiffs are entitled to protect is "not direct diversion of purchasers but indirect harm through loss of goodwill or tarnishment of reputation." *Id.* (citing *Int'l Kennel Club v. Mighty Star, Inc.,* 846 F.2d 1079 (7th Cir.1988) *and* quoting *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126 (2d Cir.1979)). Indeed, during the damages phase of this trial, Plaintiffs could not prove any lost profits but were concerned with loss of goodwill and tarnishment of reputation. *See* Findings of Fact, *supra,* No. 15–17. In proving the latter their most salient evidence was the allegedly high returned merchandise rate of THE MIRACLE BRA bikini. We have not found that this evidence establishes that the quality of THE MIRACLE BRA bikini is inferior to the quality of the MIRACLESUIT. Nevertheless we have found that it is reasonable to attribute some significant portion of Defendants' returned merchandise to the quality of the products. Findings of Fact, *supra,* No.

18. Thus, Plaintiffs' interest is in eliminating a possibility of confusion which may result in a loss of goodwill and damage to reputation, stemming mainly from mostly unsupported concerns with the quality of Defendants' products.

Given this construction of Plaintiffs' interest, we think that this factor does not weigh in favor of granting a full permanent injunction prohibiting Defendants' from using a "miracle" mark for swimwear because the interest at stake is narrow. Ideally, any type of injunctive relief should be concerned with eliminating the possibility of confusion which may lead to damage to Plaintiffs' reputation and goodwill. We note that standing alone a full injunction prohibiting Defendants from using a "miracle" mark for swimwear would do little to alleviate any existing confusion and resulting damage to reputation and goodwill which may have already occurred. However, relief in the form of a disclaimer is the more likely candidate for correcting any consumer misperceptions as to the source of the parties' products and repairing damage to Plaintiffs' reputation and goodwill.

## 2. Nature and extent of wrongful conduct

■ The limited wrongful conduct in this case weighs against granting a full permanent injunction prohibiting Defendants from using a "miracle" mark for swimwear. As we noted repeatedly in our opinion during the liability phase of this trial, Plaintiffs failed to prove bad faith, deliberate intent, illegitimacy, or willfully tortious conduct on the part of Defendants. *A & H Sportswear*, 926 F.Supp. at 1255, 1261, 1267–68. Defendants conceived of and adopted THE MIRACLE BRA trademark independently for lingerie and then extended their mark into swimwear, apparently assuming that such an extension would not constitute an infringement because of the wide recognition of their mark for lingerie. Defendants' voluntary implementation of a disclaimer currently with the damages phase of trial also indicates a lack of bad faith on the part of Defendants and indeed disfavors the grant of any injunctive relief at all. However, we do not believe that the lack of bad faith forecloses all types

of injunctive relief; we believe that Plaintiffs may be awarded at least some form of injunctive relief because Defendants voluntarily assumed the risk of infringing Plaintiffs' mark, however remote it may have seemed, when they chose to extend THE MIRACLE BRA mark into swimwear. *See A & H Sportswear*, 926 F.Supp. at 1255.

## 3. Relative adequacy to the plaintiff of an injunction and of other remedies

■ We believe that without the injunctive relief of a disclaimer, Plaintiffs will not be made whole. As will be explained below in the section on monetary relief, Plaintiffs are not entitled to any damages beyond the award of a reasonable royalty for the period leading up to the trial on damages. Neither party presented evidence that the parties would have negotiated a reasonable royalty in the form of a lump sum payment that would have permitted Defendants to use a "miracle" mark for swimwear indefinitely. Likewise, neither party presented any evidence to allow this court to determine a damages award based on such a paid-up license.

Similarly, Plaintiffs cannot prove that they have lost any profits. Their sales have increased. Findings of Fact, *supra*, No. 15. Plaintiffs claim that corrective advertising is necessary but they have not taken steps to correct any possible misperceptions on their own. It is not clear how money for such corrective advertising would accomplish the goal of relieving any possible misperceptions as Plaintiffs have not provided any evidence on how to accomplish such corrections. Finally, the harm to Plaintiffs' interest has been in the form of a possibility of confusion affecting Plaintiffs' reputation and goodwill. This type of damage is largely unquantifiable and neither party has attempted to quantify it.

We believe a disclaimer can more effectively help eliminate past and future confusion resulting in damage to Plaintiffs' reputation. We have found that the MIRACLESUIT is targeted to a consumer pool similar to Defendants' products. *A & H Sportswear*, 926 F.Supp. at 1263. At this point in time only VS Catalogue sells THE MIRACLE BRA

Bikini. Findings of Fact, *supra,* No. 27. VS Catalogue advertises almost exclusively through its own catalog. Findings of Fact, *supra,* No. 22. VS Catalogue distributes more than 145 million catalogs throughout the United States in a given year. Findings of Fact, *supra,* No. 26. Indeed, VS Catalogue is now the leading mail-order retailer of swimwear, holding almost 40% of the market. Findings of Fact, *supra,* No. 11. We believe that given these and other circumstances, a disclaimer can effectively inform much of the target pool of MIRACLESUIT customers that THE MIRACLE BRA Bikini is not made by the same company as MIRACLESUIT thereby helping to restore and/or prevent the erosion of Plaintiffs' goodwill and reputation. Given the effectiveness of a disclaimer in serving Plaintiffs' narrow interest, we believe that a full permanent injunction prohibiting Defendants from using a "miracle" mark for swimwear would be inequitable. *Restatement (Third) of Unfair Competition* § 35, comment (c) ("If the defendant has acted in good faith and prospective purchasers can be adequately protected by disclaimers or other limited relief ... the scope of the injunctive may be appropriately narrow."); Findings of Fact, *supra* Nos. 20, 22, 24.

### 4. The harm likely to result to the legitimate interests of the parties

██ We believe that this factor weighs in favor of granting injunctive relief in the form of a disclaimer. Defendants had a legitimate interest in extending their own mark—THE MIRACLE BRA. *See A & H Sportswear,* 926 F.Supp. at 1264 ("A trademark owner's expansion of its use of its trademark into related fields, provided it does not conflict with the rights of a prior user of the same or a similar mark, does strengthen the owner's rights.") Indeed, Defendants have a legitimate right in extending their mark to the extent that it does not create a possibility of confusion with Plaintiffs' product. We believe that a disclaimer will effectively remedy much of any possibility of confusion, helping Defendants to extend their mark legitimately. We believe that a great deal is at stake for Defendant VS Catalogue, because The MIRACLE BRA swimwear has helped VS

Catalogue to position itself as the leading mail-order retailer of swimwear. Findings of Fact, *supra,* No. 3. *See also* Findings of Fact, *supra,* Nos. 6, 7, 8. These interests would be harmed unnecessarily if a full permanent injunction prohibiting Defendants from using a miracle mark for swimwear was issued.

We also believe that the harm to the legitimate interests of Plaintiffs if all injunctive relief is denied weigh in favor of granting injunctive relief in the form of a disclaimer. We do not think a full injunction is appropriate because, among other reasons, Defendants' products are not inferior to Plaintiffs' products and because Defendants have not been riding on the success of Plaintiffs. However, we believe that denial of an injunction in the form of a disclaimer would harm Plaintiffs unnecessarily. Defendant VS Catalogue's wide distribution of its catalog might permit the targeted pool of THE MIRACLE BRA and MIRACLESUIT customers to believe that both products are from the same maker. On the other hand, the same distribution when linked with a disclaimer would permit that same target pool to become informed as to the distinct sources of the MIRACLE BRA Swimsuit and MIRACLESUIT products.

We think this factor weighs neutrally with respect to denying a full permanent injunction against VS Stores. The harm to VS Stores appears to be minimal. Defendant VS Stores has not had THE MIRACLE BRA swimwear in its stores for well over a year. Findings of Fact, *supra,* No. 27. Furthermore, it has no plans to include swimwear in its line in the future. Findings of Fact, *supra,* No. 27. However, VS Catalogue would be harmed if a full injunction was issued with respect to VS Stores because such an injunction would impair its ability to conduct point of sale research even when the disclaimer in their catalog as well as on hangtags eliminated most infringement by eroding any possibility of confusion. However, we do not believe the legitimate interests of Plaintiffs would be similarly harmed. There is no reason to believe that the quality of Defendant VS Store's swimwear would be inferior. Given the existence of an a disclaimer in the widely distributed catalog and

on any hangtags dispelling much of any possibility of confusion, we doubt permitting VS Stores to sell THE MIRACLE BRA swimwear in the future when accompanied by a disclaimer would substantially harm Plaintiffs' legitimate interests.[8]

### 5. The interests of third persons and of the public

The interests of the public weigh in favor of granting a partial injunction in the form of a disclaimer. We are very concerned here with the public interest in preventing confusion as to the source of products and in facilitating legitimate competition. The public has indicated a wide desire to purchase Defendants' THE MIRACLE BRA goods. We have found that this public desire has not been a result of direct diversion of Plaintiffs' goods. We believe that the public is well served by being able to identify Defendants' swimwear and its cleavage enhancing purpose and construction through the use of Defendants' THE MIRACLE BRA mark. If Defendants were completely prohibited from using the trademark THE MIRACLE BRA in conjunction with its cleavage enhancing swimwear the public may well become more confused as to the swimwears' source and relevant features.[9] We also believe that this risk of misunderstanding would have resulted to some degree even if initially Defendants had chosen to use another name for a collection of mostly cleavage enhancing swimwear. To the extent that Defendants cannot brand extend their strong THE MIRACLE BRA mark even when a disclaimer eliminates much of any possibility of confusion, the public interest in the facilitation of legitimate competition is also jeopardized.

The public also has an interest in understanding the distinct source and function of Plaintiffs' products and in ensuring that trademarks in general can be relied upon. We believe that a disclaimer will serve both purposes without circumventing the public interest in readily identifying the source and purpose of Defendants' products. A disclaimer will permit the public to disassociate Plaintiffs' MIRACLESUIT from Defendants' products. Because the Defendants have not acted in bad faith we believe that such a disclaimer will not substantially encourage the infringement of trademark laws. While such a disclaimer will not eliminate confusion in a case in which a consumer is looking at a display of MIRACLESUITS and believes that such a display contains cleavage enhancing products, we believe that the disclaimer remedy will eliminate much of any possibility of confusion.

### 6. Any unreasonable delay or wrongful conduct by Plaintiffs

Plaintiffs did not delay in bringing suit in this action or requesting injunctive relief. However, their promptness does not alter our judgement that the balance of the factors weighs in favor of granting an injunction in the form of a disclaimer.

We do not feel that Plaintiffs, conduct weighs decidedly in favor or against a particular form of relief. However, while not necessarily wrong, Plaintiffs' failure to present its own formulation of a disclaimer at the damages stage of the trial or to outline a counter proposal for a form of corrective advertising, gives this court increased confidence in Defendants' own display of good

---

**8.** It is true that Plaintiffs may well be harmed if we permit Defendants to operate in their market under Defendants' mark. However, the issue is to what extent Plaintiffs have a legitimate interest in limiting competition, once much of any possibility of confusion has been eliminated through the use of a disclaimer. *Restatement (Third) of Unfair Competition* § 35, comment (c) ("[I]f a broad prohibition would seriously inhibit legitimate competition, the scope of an injunction may be appropriately narrow."). We believe that a full permanent injunction prohibiting Defendants from using a "miracle" mark for swimwear is too broad and would seriously inhibit legitimate competition.

**9.** *See Champion Spark Plug Co.,* 331 U.S. at 126–128, 67 S.Ct. at 1137–38 (The word "Champion" may remain on reconditioned Champion spark plugs provided packaging clearly indicates they were reconditioned because "[t]he spark plugs, though used, [were] nevertheless Champion plugs and not those of another make."). Similarly, in this case Defendants' THE MIRACLE BRA bikini "has the same features as THE MIRACLE BRA (bra), namely, angled underwires, push-up pads and adjustable pads" and is sold by the same company as THE MIRACLE BRA (bra). *A & H Sportswear,* 926 F.Supp. at 1238.

faith and corresponding formulation of a disclaimer.[10]

### 7. The practicality of framing and enforcing an injunction

Similarly, we do not believe that the practicality of framing and enforcing an injunction recommends the use or disuse of any particular remedy. While Plaintiffs have expressed concern about the need to return to court if a disclaimer is granted, we do not believe that concern should prevent our grant of an disclaimer. Plaintiffs have not proven Defendants acted in bad faith. In addition, Defendants' management harbors a sincere belief that they can comply with the instructions of this court. Findings of Fact, *supra*, Nos. 20, 22. Accordingly, we remain convinced that a disclaimer is an appropriate remedy and should be applied to both Defendants.

### D. Conditioning Use on Payment of a Reasonable Royalty

We have stressed the appropriateness of a disclaimer and the inappropriateness of a full permanent injunction prohibiting Defendants from using a "miracle" mark for swimwear because, as discussed above, our remedy should be no broader than necessary to provide full relief to Plaintiffs and should not prohibit legitimate competitive activities. However, this court will also issue an injunction prohibiting Defendants from using a "miracle" mark for swimwear unless Defendants periodically pay Plaintiffs a reasonable royalty for the use of a "miracle" mark. In addition to the reasons discussed below, we award this relief because (1) a disclaimer will eliminate much, but not all, of the possibility of confusion in this case, (2) the scope of injunctive relief is typically resolved against the wrongdoer, and (3) although Plaintiffs have not proven bad faith Defendants as infringers are the more culpable.

An injunction conditioning use upon the payment of a reasonable royalty has support in the law of intellectual property, especially with the law of trade secrets. However, as we discuss this form of relief, we reiterate that we have substantial discretion in defining the terms of an injunction and that injunctive relief is to be molded to the necessities of a particular case. *Coca–Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1256 n. 16 (9th Cir.1982); *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61–62, 95 S.Ct. 2069, 2077–78, 45 L.Ed.2d 12 (1975).

### 1. Patent Law

Conditioning future use upon the payment of a reasonable royalty has only limited support in patent law. However, we believe the factors that might disfavor such relief in patent law are less salient in trademark law. In *Stickle v. Heublein*, 716 F.2d 1550, 1561 (Fed.Cir.1983), the Federal Circuit held that the appropriate damage award was a lump sum payment of a reasonable royalty since an actual negotiation between the parties would have yielded a paid-up license for making and using the patented inventions. The court in *Stickle* held that an injunction must be modified to permit the use of the existing machines because the lump sum payment created an implied in law license. *Id.* at 1563. The Court did distinguish an implied in law license from a compulsory license. *Id.* In essence, injunctive relief against use was inappropriate in *Stickle* because the infringer had already made the patent holder whole. *Id.* In *Trans–World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1565 (Fed.Cir. 1984), the Federal Circuit stated that if the jury in that case awarded damages based upon a flat fee for use of the patent, the district court may then modify the injunction to eliminate the prohibition against use. The court in *Trans–World* noted that while a

---

**10.** Plaintiffs did not present an alternative model of a disclaimer that Defendant VS Catalogue could have voluntarily implemented during trial. Plaintiffs' counsel did suggest on cross examination that Defendants should implement a headline the size of a banner on catalog spreads including THE MIRACLE BRA swimwear; we have not found this suggestion helpful. While it is almost too ludicrous to point out, we think

such an obtrusive banner would destroy the overall look and feel of the catalog, adding to consumer confusion and interfering with VS Catalogue's ability to convey any message to a consumer. Thus, such a disclaimer would be decidedly against the public interest. For this reason we will not require a banner-sized disclaimer, nor do be believe a larger disclaimer than the one presented by Defendants is appropriate.

district court has discretion on whether to enter an injunction, the exercise of that discretion cannot be arbitrary and "[a] patent gives 'the right to exclude others from making, using or selling the invention.'" *Id.* at 1564. While the district court could have denied injunctive relief, once it determined to provide such relief "it could not properly deny the one element of that relief that was necessary to make it effective." *Id.*

The statutory authorization for an award of injunctive relief is nearly identical under both patent and trademark law. Under 35 U.S.C. § 283, a court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." Similarly, federal courts may grant injunctive relief according to the principles of equity and upon such terms as they deem reasonable, "to prevent the violation of any right of the registrant of a mark." *The Lanham Act* § 35, 15 U.S.C. § 1116. Thus, for both patent and trademark law, the justification for the issuance of any injunction is to prevent the violation of the holder's rights.

Although they are similar, the rights of a patentee and a trademark registrant are far from identical. The patent statute grants a patentee the right to exclude others from making, using, or selling the patented invention for a fixed and definite period of either 17 or 20 years. 35 U.S.C.A. §§ 154, 271(a) (West 1997). For this period of time the patentee may choose to do nothing with the patent. *King Instruments Corp. v. Perego,* 65 F.3d 941, 950–51 (Fed.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1675, 134 L.Ed.2d 778 (1996). Thus, the nature of the patent right itself is the right to exclude others. *ALM Surgical Equipment, Inc. v. Kirschner Medical Corp.,* 15 U.S.P.Q.2d 1241, 1253, 1990 WL 123996 (D.S.C.1990). The exclusion of others is tied powerfully to the policy justification for the issuance of a patent -promoting the progress of the useful arts:

Without this injunctive power of the courts, the right to exclude granted by the patent would be diminished, and the express purpose of the Constitution and Congress, to promote the progress of the useful arts, would be seriously undermined. The patent owner would lack much of the 'leverage' afforded by the right to exclude, to enjoy the full value of his invention in the market place. Without the right to obtain an injunction, the right to exclude granted to the patentee would have only a fraction of the value it was intended to have, and would no longer be as great an incentive to engage in the toils of scientific and technological research.

*ALM Surgical Equipment,* 15 U.S.P.Q.2D at 1254 (quoting *Smith Int'l, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1577–78 (Fed.Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983)).

Trademark rights differ in several respects from patent rights. First, the Lanham Act affords the trademark registrant an exclusive right to the use of the registered mark for specified goods and services. 15 U.S.C. § 1057(b); *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 204, 105 S.Ct. 658, 666–67, 83 L.Ed.2d 582 (1985). However, such an exclusive right can last indefinitely, provided that the registrant does not abandon the mark or fulfill the requisites for another enumerated defense. *See* 15 U.S.C.A. § 1127, 1115 (West 1997); *Philadelphia Jaycees,* 639 F.2d at 137–138; *Defiance Button Machine Co. v. C & C Metal Products Corp.* 759 F.2d 1053, 1059–60 (2d Cir.), *cert. denied,* 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). Indeed, in marked contrast to the rule in patent law, "trademark ownership results only from use, not from registration." *Jean Patou, Inc. v. Theon, Inc.,* 9 F.3d 971, 974 (Fed.Cir.1993). Finally, the policy justification for trademark protection is more complex than the justification for the grant of a patent.

More specifically, "[t]he Lanham Act was intended to make actionable the deceptive and misleading use of marks' and to 'protect persons engaged in ... commerce against unfair competition.'" *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 767–68, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615, (1992) (quoting 15 U.S.C. § 1267); *See also Intel Corp. v. Terabyte International, Inc.,* 6 F.3d 614, 618 (9th Cir.1993). "[T]rademark policies are designed '(1) to protect consumers

from being misled as to the enterprise, or enterprises, from which the goods or services emanate or with which they are associated; (2) to prevent an impairment of the value of the enterprise which owns the trademark; and (3) to achieve these ends in a manner consistent with the objectives of free competition.'" *Anti–Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296, 300–01 (9th Cir.1979). The Senate Report on the Lanham Act elaborated on the consumer and business protection functions:

> "The purpose underlying any trade-mark statute is twofold. One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats."

*Two Pesos*, 505 U.S. at 782, 112 S.Ct. at 2764 (Stevens, J. concurring) (quoting S.Rep. No. 1333, 79th Cong., 2d Sess., 3 (1946)). Unlike in a typical patent law case, the court in a trademark case aims to provide equitable relief which protects the consumer, the trademark registrant, and the spirit of fair competition. To provide such an equitable result, courts may find it more appropriate to grant an injunction conditioning use upon the periodic payment of a reasonable royalty rather than to grant a full permanent injunction against use of a trademark.

In any case, as explained below, we are convinced of the exceptional circumstances involved in this case. Given these exceptional circumstances and our discretion, we believe the most appropriate relief will condition Defendants' future use of a "miracle" mark with regard to swimwear on the payment of a reasonable royalty.

### 2. The law of trade secrets

Conditioning future use upon the payment of a reasonable royalty is permitted in exceptional cases in the law of trade secrets. The Uniform Trade Secrets Act (UTSA) has been adopted in modified form by thirty-six states,

including the District of Columbia. Donald J. Curry, *Obtaining and Enforcing Effective Injunctive Relief in Trade Secret Cases*, 340 PLI/Pat 565, 587 (citing Melvin F. Jager, *Trade Secrets Law Handbook*, § 3.04 (1991)); Christopher Rebel J. Pace, *The Case for a Federal Trade Secrets Act*, 8 Harv. J.L. & Tech. 427, 469 n. 17 (1995). The act generally codifies common law principles. Mod Int. Prop. CH 1, II, B (citing Unified Trade Secrets Act § 1, 14 U.L.A. 402 (1985 & Supp. 1990)). *See also Laurie Visual Etudes, Inc. v. Chesebrough–Pond's, Inc.*, 105 Misc.2d 413, 422, 432 N.Y.S.2d 457, 463 (1980) (trade secret misappropriation case in which the court established a perpetual royalty) ("Plaintiff is also entitled to a declaration in the judgment that its share in all ensuring gross sales commencing August 1, 1980, shall be ten percent, to be remitted quarterly on the fifteenth day following the completion of each quarter together with a verified statement of gross sales."), *rev'd on other grounds*, 83 A.D.2d 505, 441 N.Y.S.2d 88 (1981). The UTSA provides:

> § 2. Injunctive Relief. . . .

> (b) In exceptional circumstances, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time for which use could have been prohibited. Exceptional circumstances include, but are not limited to, a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation that renders a prohibitive injunction inequitable.

*Uniform Trade Secrets Act*, U.L.A. Trade Secrets Act § 2 (West 1997). The comments to the UTSA elaborate on when an injunction conditioning use on the periodic payment of a reasonable royalty is appropriate:

> Section 2(b) deals with the special situation in which future use by a misappropriator will damage a trade secret owner but an injunction against future use is inappropriate due to exceptional circumstances. Exceptional circumstances include the existence of an overriding public interest which requires the denial of a prohibitory injunction against future damaging use and a person's reasonable reliance upon acqui-

sition of a misappropriated trade secret in good faith and without reason to know of its prior misappropriation that would be prejudiced by a prohibitory injunction against future damaging use.

*Id.,* Comment (1990 Main Volume).

While this comment speaks of "exceptional circumstances" we believe that the essence of the codification is the need to balance harm to the plaintiff with the other equities in a particular case in order to award appropriate relief. In the exceptional case before this court, we believe the most equitable relief would include an injunction conditioning future use upon the payment of a reasonable royalty. As discussed elsewhere in this opinion, Plaintiffs' interest in this case is narrow, Plaintiffs have only proven a *possibility* of confusion, Plaintiffs have not proven that Defendants acted in bad faith, and Defendant Victoria Secret's Catalogue is likely to suffer harm to its legitimate interests inconsistent with the spirit of competition if we grant a full injunction prohibiting future use of a "miracle" mark. We also believe that public confusion would increase if Defendants were to cease using their THE MIRACLE BRA mark for their cleavage enhancing swimwear collection. We believe that some form of injunctive relief is appropriate in view of the fact that monetary relief is not completely available. The most appropriate relief to remedy the possibility of confusing which threatens to result in the tarnishment to Plaintiffs' reputation and good will include a widely published disclaimer. However, Defendants have only shown that a disclaimer will be effective in eliminating much of a possibility of confusion; we do not believe that Defendants have proven that a disclaimer will effectively eliminate all of the possibility of confusion in this case. However, even if the only confusion that remains after the disclaimer is widely published in the catalog and on THE MIRACLE BRA swimwear hangtags is the confusion when customers see a MIRACLESUIT without a disclaimer, we believe that the Plaintiffs face some possibility of a continuing harm.

However, given the strong equities in favor of permitting the Defendants to use their own mark with swimwear, we believe Plain-

tiffs should not be able to hold Defendants (particularly VS Catalogue) and their very profitable line of swimwear hostage to the detriment of society's interest in competition. Fortunately, the evidence presented in this case on the determination of a reasonable royalty and during the liability phase of this trial, allows us to create a more equitable solution.

Specifically, we will enjoin Defendants from using THE MIRACLE BRA or any other "miracle" mark with respect to swimwear, unless they pay Plaintiffs a reasonable royalty of 2% on a periodic basis. In our discussion of a reasonable royalty in the monetary relief portion of this opinion, we determined that Plaintiffs are entitled to a 4% reasonable royalty for the period before the trial on damages. However this 4% figure is too high for the period following Defendants' implementation of a disclaimer in November 1996, concurrently with our trial on damages. *See* Findings of Fact, *supra,* No. 26. The disclaimer has value for Plaintiffs. Plaintiffs were willing to give Defendant VS Catalogue at least a 2% and probably a 6% discount on Plaintiffs' MIRACLESUIT swimwear for Plaintiffs, MIRACLESUIT trademark to appear in Defendant VS Catalogue's catalog. *A & H Sportswear,* 926 F.Supp. at 1242–43. We are mindful that the negotiated discount on MIRACLESUIT swimwear is not identical to a reduction in a royalty based on Defendants' sales of THE MIRACLE BRA swimwear. Likewise, a disclaimer may not offer all of the advantages for Plaintiffs that the mention of its trademark beside its own goods when those goods were the only ones using a "miracle" mark may have had. However, we believe that the discount and disclaimer are sufficiently analogous to a reduction in a reasonable royalty based on Defendants' sales and the appearance of the MIRACLESUIT mark with its own goods to permit us to reduce the reasonable royalty figure by the conservative figure of 2%. We are confident that this percentage resolves all uncertainties in favor of Plaintiffs. Our confidence in this figure is increased by the fact that this disclaimer will be displayed far more frequently than the word MIRACLESUIT ever would have been if

Defendants were only displaying it in conjunction with the display of Plaintiffs, products.

Finally, while we are not unaware that the form of injunctive relief we issue in this case is more likely to require a return to court by either party than the issuance of a full permanent injunction against use of a "miracle" mark for swimwear, we are particularly impressed by the good faith shown by Defendants in this case and believe that continuous monitoring by this court is far less likely to be necessary in this case than under other circumstances.

### E. *Monetary Relief*

#### 1. General Considerations

■ As noted above, Section 35 of the Lanham Act provides for a variety of monetary remedies after a violation of the act has been established: an accounting of defendant's profits, damages sustained by the plaintiff, and the costs of the action. Pecuniary recovery is subject to the principles of equity and a mere showing of infringement will not mandate an award of monetary relief. *Williamson–Dickie Mfg. Co.,* 251 F.2d 924.

■ In calculating *profits,* Defendants must prove all elements of cost or deduction claimed. 15 U.S.C. § 1117; *Williamson–Dickie Mfg. Co.,* 251 F.2d at 927. However, for an award of *damages,* a plaintiff must prove the existence of actual damages. *Caesars World, Inc. v. Venus Lounge, Inc.,* 520 F.2d 269, 274 (3d Cir.1975); *Brand v. NCC Corp.,* 540 F.Supp. 562, 565 (E.D.Pa.1982). While a plaintiff bears the burden of proving both the existence of damages and the amount of damages, a plaintiff is held to a lower burden of proof in ascertaining the latter. *BASF Corp. v. Old World Trading Company, Inc.,* 41 F.3d 1081, 1094 (7th Cir. 1994) (citing *Otis Clapp & Son, Inc. v. Fil-*

*more Vitamin Co.,* 754 F.2d 738, 745 (7th Cir.1985)).

#### 2. Accounting of Profits

■ We will not grant Plaintiffs an accounting of profits in this case. The award of profits is "ordinarily reserved for cases of intentional misconduct." *Restatement (Third) of Unfair Competition* § 36, comment (g); *Robert Bruce, Inc. v. Sears, Roebuck & Co.,* 343 F.Supp. 1333, 1349 (1972). Of course, "the equity of intent should not be viewed in the abstract but must be balanced with the actual or likely harm to the innocent trademark owner." *Robert Bruce,* 343 F.Supp. at 1349.

In the case at bar we have found limited evidence of actual confusion, only a possibility of confusion, and no intent to deceive the public or to cause confusion.[11] Thus, we feel that an award of profits is inappropriate.

#### 3. Corrective Advertising

■ We do not believe a monetary award of prospective corrective advertising is appropriate in this case.[12] Plaintiffs' best argument relies on the award of corrective damages in the seminal case of *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 408 F.Supp. 1219 (D.C.Colo.1976) (*"Big O I"*), aff'd as modified, 561 F.2d 1365 (10th Cir.1977) (*"Big O II"*), cert. dismissed, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978). The *Big O* tires litigation is distinguishable from this case. First, the Defendant in *Big O I* had acted in wanton and reckless disregard for the plaintiff's rights. Such conduct has not been proven here. *Big O I,* 408 F.Supp. at 1233. Secondly, the fact of damage had been established with reasonable certainty. *Big O II,* 561 F.2d at 1232–33. Such damage, other than in the form of a reasonable royalty, has not been established here. *See* Findings of Fact, *supra,* Nos. 15, 17–18. These elements were em-

---

**11.** It may be true as contended by Plaintiffs that "the nature of the defendant's knowledge or intent that is sufficient to support an accounting has also been unclear." *Restatement (Third) of Unfair Competition,,* § 37, comment (b) (citing *P.E. Sharpless Co. v. Lawrence,* 213 F. 423 (3d Cir.1914)). However, we feel confident that Defendants' conduct has not approached this level.

**12.** Plaintiffs have not claimed or proven that they are entitled to damages for corrective advertising expenditures they have already made. Accordingly, we will not award such relief.

phasized in the defendant's use in *Big O I* of plaintiff's exact mark. *See Big O I*, 408 F.Supp. at 1222–1232. Again, that is not the case here. Finally, the finder of fact in *Big O* had found that a sizable damages award had been proven. *Big O*, 408 F.Supp. at 1230. We will make no such finding. In addition, we think the disclaimer eliminates much of the need for such advertising.

## 4. Reasonable Royalty

■ Under the circumstances of this case we believe the most appropriate and accurate damages remedy would be to award Plaintiffs a reasonable royalty. We think this measure of damages can be ascertained with reasonable certainty. With little Third Circuit guidance on the award of a reasonable royalty in trademark cases, we base our decision largely on the *Sands* litigation in the 7th Circuit. *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir.1992) ("*Sands I*"); *Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340 (7th Cir.1994) ("*Sands II*").

In *Sands I*, the 7th Circuit encountered a case in which the parties had no previous licensing relationship, in which the plaintiff failed to present any evidence of lost profits or sales, and in which an award of a percentage of defendant's profits under a balancing of the equities was inappropriate. *Sands I*, 978 F.2d at 963; *Sands II*, 34 F.3d at 1342, 1350. The *Sands II* court explained that in calculating the base figure for determining the appropriate award "the district court ought to begin with the one measure of actual damages that, if ascertained with reasonable certainty, could be said to reflect the actual loss of [the plaintiff]—the cost of a reasonable royalty." *Sands II*, 34 F.3d at 1350.

Other Circuits have stated that a reasonable royalty may be a proper measure of damages in a trademark case. *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir.1986) (noting that royalties normally received for the use of a mark are the proper measure of damages for the misuse of the mark). *See also Bandag, Inc. v. Al Bolser's Tire Stores*, 750 F.2d 903, 920 (Fed.Cir.1984) ("[r]oyalties normally received

for the use of a mark *may* be a proper measure, *if* that measure comports with the equitable limitations of section 1117 and bears a rational relationship to the rights appropriated.").

In the case before us, we believe an award of a reasonable royalty is appropriate. Plaintiffs have presented no evidence of lost profits or sales. We have determined that the equities do not weigh in favor of awarding some percentage of Defendants' profits, especially since Plaintiffs have not proven bad faith in this case. However, we believe that the evidence presented in this case, including the testimony of financial experts at trial, will permit us to ascertain a reasonable royalty that is rationally related to the rights appropriated by Defendants. *See* Findings of Fact, *supra*, No. 12–14. To ensure that the reasonable royalty bears a rational relationship to the rights appropriated in this case, we will postulate Defendants' expectation of a profit and Plaintiffs' compensation for Defendants' extension of THE MIRACLE BRA mark into the swimwear realm to the extent that it created a possibility or risk of confusion. *See Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1122 (S.D.N.Y.1970) ("The very definition of a reasonable royalty assumes that, after payment, 'the infringer will be left with a profit.' "); *Bandag*, 750 F.2d at 920.

■ In calculating the reasonable royalty a district court may also consider:

(1) royalty rates received in prior licenses by the licensor;

(2) prior rates paid by the licensee;

(3) the licensor's licensing policies;

(4) the nature and scope of the infringer's infringing use;

(5) the special value of the mark to the infringer;

(6) the profitability of the infringer's use;

(7) the lack of viable alternatives;

(8) the opinion of expert witnesses; and

(9) the amount that the licensor and licensee would have agreed upon in voluntary negotiations.

*Sands, Taylor & Wood v. Quaker Oats Co.*, No. Civ.A.84–8075, 1993 WL 204092 at *4

(N.D.Ill. June 8, 1993) (citing *Georgia–Pacific Corp.*, 318 F.Supp. at 1122 (S.D.N.Y.1970)). The court's approach should take into account "what the parties 'would have agreed upon, if both were reasonably trying to reach an agreement.'" *Georgia–Pacific Corp.*, 318 F.Supp. at 1121 (quoting *Faulkner v. Gibbs*, 199 F.2d 635, 639 (9th Cir.1952)). "In applying the formulation, the Court must take into account the realities of the bargaining table and subject the proofs to a dissective scrutiny." *Georgia–Pacific Corp.*, 318 F.Supp. at 1122.

■ The ambiguities in fashioning relief based on a reasonable royalty require "a court to take special care to ensure that the royalty payment has not undercompensated the victim," including enhancement of damages attributable to a lost royalty that ensures that "the malefactor, and not the victim, bears the burden of any uncertainty in its calculation." *Sands II*, 34 F.3d at 1351. However, a court should not double-count factors used in making the baseline royalty figure when calculating an enhancement. *Sands II*, 34 F.3d at 1352.

■ We believe a reasonable royalty would be 4% of Defendants' sales.[13] This court was not presented with evidence of royalty rates received in prior licenses by Plaintiffs or paid by the Defendants. However, we note that Defendant VS Catalogue's president has conceded that the "THE MIRACLE BRA" name is critical to the success of "THE MIRACLE BRA" swimsuit. Findings of Fact, *supra*, No. 8. In addition, we do not ignore the fact that brand names appear to be very key to Defendants' business philosophy; indeed Defendants' parent company is entitled Intimate Brands. (Pls.' Ex. 410).

Plaintiffs' policy was against granting a license of its MIRACLESUIT mark because of competition, loss of control over the mark and reputation, and loss of control over quality. Findings of Fact, *supra*, No. 16. However, we believe that at a negotiating stage,

Defendants' choice of Cole of California as a manufacturer would have satisfied some of Plaintiffs' concerns regarding the quality of swimsuits. Findings of Fact, *supra*, No. 17–18. Thus, we believe Plaintiffs' primary concern in negotiating with Defendants would have been competition and loss of control over its mark. We believe concern over control of its mark is of less importance here where Defendants would have sought to extend their own mark. We are not convinced that Plaintiffs were concerned only with competition with THE MIRACLESUIT; we suspect Defendants may have harbored at least some concern that Defendants would compete with its other swimwear lines.

At the negotiating stage, we believe Defendants would have sought only to extend their own mark to an extent that would create a possibility of confusion with the Plaintiffs' mark as to source but which would not trade on the success of Plaintiffs' own mark.

However, a license would have had a special value to Defendants because it would have permitted them to trade on the success of their own already established mark without infringement of Plaintiffs' mark.

Infringement was extremely profitable to Defendant VS Catalogue and became the anchor for marketing all of its swimwear products. Findings of Fact, *supra*, Nos. 2–4, 11. Infringement has also been profitable for Defendant VS Stores. Findings of Fact, *supra*, No. 2–4. Defendants have not presented any evidence as to other alternatives to a "MIRACLE" mark and continue to insist that THE MIRACLE BRA mark is a key to their success with swimwear.

Plaintiffs' expert calculated a reasonable royalty of 6%. Plaintiffs' expert appears to have taken into account most of the above factors. Defendants' expert calculated a reasonable royalty of 1.7% based on multiplying the 6% figure by the ratio of THE MIRACLE BRA swimwear sales over THE MIRACLE BRA sales of all products. (Defs.' Ex.

---

**13.** While Defendant VS Stores no longer sells THE MIRACLE BRA swimwear, we believe that at a negotiating phase the parties would have treated Defendants as a unit and agreed upon the same royalty figure for both Defendants. We base this determination on the Defendants joint efforts in acquiring THE MIRACLE BRA mark and use of the same trademark counsel. *A & H Sportswear*, 926 F.Supp. at 1240. We believe that a 4% royalty remains appropriate for both Defendants because both Defendants did profit from their infringement.

290). The Defendants' expert's rationale was that a license to use THE MIRACLE BRA mark for swimwear would have to be apportioned because the Defendants already had the right to use the mark for other products. We do not credit this methodology and this expert for many reasons, including that the Plaintiffs' reasonable royalty will be a percentage of THE MIRACLE BRA swimwear sales, not total sales of THE MIRACLE BRA products.

Defendants' expert also objected to Plaintiffs' 6% royalty on two other grounds. The expert opined that (1) Plaintiffs' expert had relied too much on the royalty rates that A & H had negotiated for marks that have gained wide recognition from other media and that (2) Plaintiffs' Miraclesuit mark has no practical value to Defendants because Defendants would be using THE MIRACLE BRA mark. We think these two arguments are intertwined and unpersuasive. First, Defendants would be licensing to use a mark that had gained wide recognition in other media—they would be licensing to use THE MIRACLE BRA with swimwear. The value of the MIRACLESUIT mark itself is not dispositive with regard to what negotiating position Defendants would take or what royalty it would be willing to pay; the key is Defendants' value of the right to use THE MIRACLE BRA with swimwear without infringing Plaintiffs' mark. Thus, Defendants' expert's opinion is not helpful in this matter.[14]

Since the 6% figure remains unimpeached by Defendants' expert, we focus at this point on the factor which does not seem to have received adequate attention from Plaintiffs'

expert—the nature and scope of the infringer's infringing use. We think that because the nature of Defendants' infringement was indirect and the scope of that infringement was limited to a possibility of confusion, the reasonable royalty rate should fall below 6%. Weighing the narrow nature and scope of the Defendants' infringing use as well as all of the factors discussed above, we believe that a reasonable royalty should be 4%. Notwithstanding Plaintiffs' assertion, we do not believe that any enhancements of our determination of a reasonable royalty are appropriate in this case. The net sales for the period preceding the trial on damages were $27.166 million for Defendant VS Catalogue and $1.587 million for Defendant VS Stores, for a total of $28.753 million. Findings of Fact, *supra*, No. 2. Multiplying Defendants' net sales by the 4% reasonable royalty, Defendant VS Catalogue should pay $1,086,-640.00 and Defendant VS Stores should pay $63,480.00 for a total of $1,150,120.00 to Plaintiffs as damages. *See* Findings of Fact, *supra*, No. 12 (containing Plaintiffs' financial expert's illustration of how to do a reasonable royalty calculation).

## 5. Costs, Attorneys Fees, Enhanced Damages, and Punitive Damages

Plaintiffs' requests for costs, attorneys' fees, enhanced damages, and punitive damages are denied. This Court ruled on November 5, 1996 that it would not consider any award of attorneys' fees,[15] enhanced damages under § 34(a) of the Lanham Act, 15 U.S.C. § 1117(a),[16] or punitive damages [17] on the

---

**14.** The Defendants' expert's report also questioned the validity of some of the licensing agreements upon which Plaintiffs' expert relied. These concerns appear to be unfounded with respect to the majority of licensing agreements which were typical of the other agreements. Thus, the opinion of Defendants' expert remains unhelpful. (*See* Pls.' Ex. 314).

**15.** Section 35(a) of the Lanham Act provides for the award of attorneys' fees in "exceptional cases." 15 U.S.C. § 1117(a). Fees are generally awarded only when the infringement is willful or fraudulent. *Restatement (Third) of Unfair Competition* § 36 comment (*o*) (citing *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 952 F.2d 44 (3d Cir. 1991) ("malicious, fraudulent, deliberate, or willful"); *Century Distilling Co.*, 205 F.2d at 149)).

*See also Standard Terry Mills*, 803 F.2d at 782 n. 7 ("According to the Senate Report, Congress intended the Lanham Act attorneys' fees provision to encompass cases such as where the trademark infringement was 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.' "). Defendants did not act willfully, fraudulently, or in bad faith in this case. No other equities weigh significantly against them or in favor of Plaintiffs. Thus, we reiterate our denial of the request for attorneys' fees.

**16.** This court has the discretion to increase the award of damages to three times the amount of actual damages proven. 15 U.S.C. § 1117(a). Damages may be enhanced on the rationale of the difficulties in proving the amount of loss in a market context and in order to deter cases of

grounds that Plaintiffs failed to prove the intent required for imposition of such extreme measures. (11/5 at 198; The Court). Based on this same ground as well as the equities and circumstances of this case discussed above, we now exercise our discretion to deny Plaintiffs' request for costs. *See Century Distilling Co.*, 205 F.2d at 149 (In absence of showing of fraud trial judge did not abuse his discretion in refusing to allow trademark owner, as successful party, its litigation expenses).

## IV. CONCLUSION

This court has faced an issue of first impression—the determination of the appropriate relief under the circumstances when liability for trademark infringement is based only on a possibility of confusion. After considering all of the circumstances and equities involved in this case, this court will issue a permanent injunction against Defendants conditioning their use of a "miracle" mark with swimwear on the publication of a disclaimer and the payment of a periodic reasonable royalty. In addition, this court will grant Plaintiffs monetary relief in the form of a reasonable royalty on Defendants' sales. All other relief requested by the parties will be denied as inappropriate and inequitable in this case, including a full permanent injunction enjoining Defendants from using a "miracle" mark for swimwear; profits; corrective advertising; costs; attorneys' fees; an enhancement of damages; and punitive damages.

An appropriate order follows.

### REVISED ORDER

AND NOW, this 1st day of July, 1997, upon consideration of our opinion in *A & H*

*Sportswear*, 926 F.Supp. 1233 (1996); the evidence presented during trial on November 4th and 5th of 1996; Plaintiffs' Post–Trial Memorandum and Findings of Fact filed November 27, 1996; Plaintiffs' Amended Conclusions of Law filed December 10, 1996; Defendants' Response to Plaintiffs' Findings of Fact and Amended Conclusions of Law filed January 2, 1997; Defendants' Post–Trial Brief,[1] Proposed Findings of Fact, and Proposed Conclusions of Law filed January 2, 1997; Plaintiffs' Response to Defendants' Proposed Findings of Fact and Conclusions of Law filed January 13, 1997; and Plaintiffs' Reply to Defendants' Post–Trial Brief filed January 13, 1997, it is hereby ORDERED and DECREED consistent with our Decision dated June 27, 1997 that:

1. Judgment is entered in favor of Plaintiffs and against Defendant Victoria's Secret Stores, Inc. for $63,480.00;

2. Judgment is entered in favor of Plaintiffs and against Defendant Victoria's Secret Catalogue, Inc. for $1,086,640.00;

3. Defendants are hereby PERMANENTLY ENJOINED from using the mark "THE MIRACLE BRA," "MIRACLESUIT," and any other "miracle" mark in connection with swimwear including the promotion, advertising, sale, and identification of swimwear UNLESS:

> a. Defendants publish the disclaimer, "The Miracle Bra™ swimwear collection is exclusive to Victoria's Secret and not associated with MIRACLESUIT® by Swim Shaper®" in connection with any promotion, advertising, sale, or identification of such swimwear. The disclaimer shall be published on every page of any catalog spread or magazine adver-

---

egregious infringement. 2 J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30.28[2][b] at 30–133 (3d ed.1992). As we indicated in our section on an appropriate reasonable royalty, we do not find an enhancement of damages appropriate in this case. We think our determination of the appropriate reasonable royalty, the only actual damages proven in this case, needs no adjustment for market conditions. Likewise Plaintiffs have never proven bad faith, deliberate intent, or egregious infringement.

17. Plaintiffs argue that an award of punitive damages is appropriate under Pennsylvania law

because punitive damages are permitted where defendants have "reckless indifference to the rights of others." (Pls.' Post–Trial Mem. at 58, citing *Kirkbride v. Lisbon Contractors Inc.*, 521 Pa. 97, 555 A.2d 800, 803 (1989), (*quoting Restatement (Second) of Torts* § 908(2))). Reckless indifference has never been proven in this case and this court will not award punitive damages.

1. We also considered, as referenced by Defendants' Post–Trial Brief filed January 1, 1997, Defendants' Trial Memorandum filed November 1, 1996.

tisement in which a "miracle" mark appears to identify swimwear on the same page. The disclaimer shall appear in type no smaller than Defendants' disclaimer appeared in Defendants' Ex. 296. If Defendants utilize a toll free number at any point in their catalog, such toll free number shall also appear within one half inch of each disclaimer required by this paragraph. Such disclaimer shall appear in a color which clearly distinguishes it from the background on which it is printed as illustrated by Defendants' Ex. 296. In addition, the Defendants shall publish the same disclaimer in type and size described above on a hangtag on each piece of swimwear identified by reference to "THE MIRACLE BRA," or other "miracle" mark. The disclaimer is the only use Defendants' may make of the MIRACLESUIT mark;

b. Defendants' pay Plaintiffs 2% royalty of all net sales from November 6, 1996 to the date of this opinion. Said payment shall be made within 90 days of the date of this opinion; and

c. In the future, Defendants shall pay Plaintiffs 2% royalty of all net sales, to be remitted quarterly on the fifteenth day following the completion of each quarter. All payments shall be accompanied by a verified statement from a certified public accountant to the effect that the 2% royalty has been calculated as required by our opinion in this matter.

d. It is further ordered that this injunction is binding upon Defendants, their officers, agents, servants, employees, and attorneys, and all other persons in active concert with them who receive actual notice of this order by personal service or otherwise;

4. Requests for all other relief by the parties are DENIED;

5. All other outstanding motions are DENIED as moot; and

6. This case is CLOSED, however the Court will retain jurisdiction for enforcement and other appropriate purposes.

7. The purpose of this Revised Order is to correct the typographical error in the amount of judgment entered in our Order dated June 27, 1997.